Becker v. State







COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

)
WIL-ROYE INVESTMENT CO. II and             ) 
RENEWABLE INVESTMENTS, INC.,             )                  No. 08-03-00001-CV
)
                                    Appellants,                       )                             Appeal from
)
v.                                                                          )                  238th District Court
)
WASHINGTON MUTUAL BANK, FA,           )                 of Midland County, Texas
)
                                    Appellee.                          )                  (TC# CV-42,274)

O P I N I O N

            Wil-Roye Investment Co. II and Renewable Investments appeal from a take nothing judgment
entered in favor of Washington Mutual Bank following a bench trial. We affirm.
FACTUAL SUMMARY
            In January of 1995, Bill Wilson, William B. Wilson (Bill’s father), and the Roye brothers,
Mike and Walter, formed Wil-Roye Investment Company for the purpose of re-factoring invoices
purchased by Key Commercial Investments, Inc. (KCI) from its clients. KCI was owned and
operated by Steve and Tim Holder who had been in the factoring business for a number of years. 
Bill Wilson had known Steve Holder for approximately twenty years. In 1996, a second company
owned by Bill Wilson, Renewable Investments Inc., entered into an identical factoring relationship
with KCI. After KCI acquired invoices for factoring from its clients, it kept the actual invoices but
delivered to Wil-Roye or Renewable a schedule listing the invoices. Wil-Roye would then send KCI
a check for the purchase price, the face amount of the invoice less the agreed upon discount. As KCI
received payments on the invoices, it issued a check to Wil-Roye. KCI acted as agent for Wil-Roye
and Renewable both in the acquisition of the invoices and the day-to-day operation of the factoring
business. Later in 1996, Key Funding Group (KFG) replaced KCI as the entity through which Wil-Roye and Renewable did their factoring. 
            High financial risks are inherent in the factoring business because those businesses and
companies which factor their invoices are typically experiencing cash flow and/or cash management
problems. Consequently, the companies are willing to accept less than the full amount of their
invoices rather than waiting for full payment later. Factoring is significantly more expensive than
other types of financing. Given the experience of Holder, KCI and KFG in the factoring business,
Appellants knew or should have known of the risks. 
            In November of 1995, John Grist, president of Midland American Bank (MAB),


 encouraged
Bill Wilson to accept one of the bank’s customers, Riley Drilling Company, as a factoring client,
even though Riley had been past due on its loan payments to MAB, had incurred insufficient funds
check charges, and was on the bank’s “watch list.” Wilson told Grist to call Steve Holder. Grist
called Steve Holder and recommended Riley Drilling as a factoring client. According to Holder,
Grist represented that MAB would continue to extend credit to Riley Drilling. Grist denied making
these representations. Holder and KCI conducted their own due diligence regarding Riley Drilling. 
Their due diligence included a review of Riley Drilling’s account receivables list and a comparison
of that list to the bank payoff, its tax return, its internal profit and loss statement and balance sheet,
and its accounts receivable aging summaries. Holder also met with Denny Allen, the owner of Riley
Drilling. Based on Grist’s recommendation and the advice of Steve Holder and KCI, Wil-Roye
began factoring invoices of Riley Drilling. The letter agreement between Wil-Roye and KCI which
added Riley Drilling as a factoring client stated that the invoices for Riley Drilling would not exceed
$350,000. Shortly after this factoring relationship began, Riley Drilling paid off its $250,000
accounts receivable loan to MAB, an event which MAB attributed to the factoring referral. It is
undisputed that Appellants made a substantial profit from factoring Riley Drilling’s invoices until
at least April 1996. 
            In 1996, the business relationships became more entwined. In March 1996, Denny Allen
established Southwest Petroservices, Inc. (SPI), a holding company for the oil field service
businesses he owned, and Riley Drilling became a subsidiary of SPI. By April 1996, Steve Holder
had gone to work for SPI as vice-president in charge of acquisitions, and he sold some of his own
businesses to SPI. At the same time, Steve Holder also served as the manager of Investors Drilling
Equipment, LLC (IDE) which had purchased all of Riley Drilling’s rigs. IDE, in turn, leased those
rigs back to Riley Drilling. William B. Wilson owned 50 percent of IDE and was a participant in
the loan MAB made to IDE to finance the purchase of the Riley Drilling rigs. It was through the IDE
transaction that William B. Wilson and Steve Holder obtained extensive information about the
financial condition of Riley Drilling. In September 1996, the Wilson family and Julie Roye sold all
of their oil field services businesses to SPI for $5 million. The Wilson family and Julie Roye
received promissory notes for almost the entire sale price and they retained management
responsibility for the companies they sold to SPI. 
            Initially, Wil-Roye had limited its factoring of Riley invoices to less than $350,000 but in
1996, Appellants substantially increased their factoring of Riley invoices to the point that the
majority of the $4.9 million they had committed to factoring was for invoices of SPI and its
subsidiaries. Appellants made this decision even though they had learned during the course of the
factoring relationship that Riley Drilling had substantial cash flow issues. They knew that Riley
Drilling had been incurring substantial bank fees as a result of writing insufficient checks and it had
several past due accounts payable that had been converted to promissory notes. Appellants
continued factoring Riley Drilling’s invoices even though they were not obligated to do so. 
            In the two decades KCI had been in the factoring business, it had always followed the
business practice of requiring that account debtors send payments to a lock box or facility controlled
by KCI. But, in 1996, Steve Holder determined that KCI and KFG would not require that SPI or its
subsidiaries, including Riley Drilling, follow this practice. It is undisputed that in the fall of 1996,
Denny Allen and the companies with which he was affiliated, Riley Drilling and SPI, intentionally
and knowingly created bogus or fraudulent invoices and factored those invoices to obtain money
from Appellants. Appellants acquired those invoices through their agents, KCI and KFG. In early
January 1997, Steve Holder confessed to Bill Wilson that he had intentionally sold Wil-Roye a bogus
invoice. Wilson threatened to call the police if Holder did not “fix the problem.” Holder
subsequently accused others of creating the bogus invoices but at least one of those accused by
Holder said that the bad invoices had been created at Holder’s instruction. Appellants suffered
significant financial losses as a result of the fraudulent invoices. It is undisputed that MAB had no
knowledge of the fraudulent scheme. 
            Appellants filed a civil suit in El Paso County against KFG, KCI, and the Holders alleging
that KFG’s acquisition of invoices for the plaintiffs constituted a breach of their agreement. SPI and
Riley filed bankruptcy petitions in January 1997. Wil-Roye and Renewable, and their principals,
filed proofs of claim and obtained substantial recoveries. 
            On August 18, 1998, MAB filed a suit for declaratory judgment after Wil-Roye and
Renewable and their principals sent demand letters to the bank asserting that they had claims against
the bank for millions of dollars due to a check kiting scheme involving SPI and its subsidiaries,
Norwest Bank, and MAB. MAB sought a declaration that it did not owe any duties to any of the
defendants, it did not engage in a check kiting scheme, it did not injure the defendants, and it was
not liable to them. Appellants filed counterclaims based on common law fraud, fraud in a stock
transaction, conspiracy, and negligence. All of the unpaid invoices which formed the basis for the
plaintiffs’ claims were dated after October 1996. After MAB non-suited all of its claims, Wil-Roye
and Renewable were realigned as the plaintiffs while Washington Mutual, previously known as
MAB, became the sole defendant.
            On June 8, 2001, Appellants filed a motion for partial summary judgment on the limited issue
of whether Washington Mutual was liable under fraud for the representations made by Grist to Bill
Wilson and Steve Holder. Washington Mutual did not file a response but instead sought a
continuance of the summary judgment hearing based on its inability to obtain the transcript of a
deposition and its inability to depose Steve Holder. Although the trial court denied the motion for
continuance, it did not hold the summary judgment hearing as scheduled in July 2001. The court
subsequently granted Washington Mutual’s motion to cancel all existing settings based on a need
to substitute lead counsel for health reasons. Appellants later filed additional motions for summary
judgment and Washington Mutual filed its own motion for summary judgment. Washington Mutual
filed a timely summary judgment response and the trial court conducted a hearing on those motions
in December 2001. The court denied the motions for summary judgment. 
            The case proceeded to a trial before the court. At the conclusion of a lengthy trial, the court
found that MAB negligently misrepresented information to Appellants, but their losses were not
caused by MAB. The court determined that their losses were the direct result of a criminal and
fraudulent scheme to create fraudulent invoices generated by individuals working within the
plaintiffs’ factoring business. Accordingly, the trial court found against Appellants on all of their
claims. At Appellants’ request, the court entered findings of fact and conclusions of law. 
DENIAL OF SUMMARY JUDGMENT
            In their first issue, Appellants contend that the trial court erred in denying their motion for
partial summary judgment because Washington Mutual did not file a timely response prior to the
initial hearing scheduled in July of 2001. Citing City of Houston v. Clear Creek Basin Authority,
589 S.W.2d 671, 678 (Tex. 1979), they argue that absent a timely written response, the motion for
summary judgment should have been granted since it was sufficient as a matter of law. It is well
established that an order denying summary judgment is not reviewable on appeal after the case has
been tried on the merits. Reese v. Duncan, 80 S.W.3d 650, 665 (Tex.App.--Dallas 2002, pet.
denied); Carr v. Weiss, 984 S.W.2d 753, 760 (Tex.App.--Amarillo 1999, pet. denied). Issue One



is overruled.
EXTENSION OF SCHEDULING DEADLINES
            In Issue Two, Appellants complain that the trial court amended a scheduling order after
certain deadlines had passed because the court concluded that Harris Kerr, lead counsel for
Washington Mutual, had become incapacitated due to illness. They complain that the record does
not support the trial court’s determination that Mr. Kerr was incapacitated due to illness.
            The trial court entered a scheduling order on December 20, 2000. Among other things, the
order contained a deadline for the designation of experts (February 15, 2001), completion of
discovery (May 1, 2001), and the filing of dispositive motions (May 1, 2001). The order also set the
trial date for May 29, 2001. With the agreement of the parties, the court modified the schedule with
an amended scheduling order filed on May 16, 2001


 and set the trial for September 10, 2001. On
June 8, 2001, Appellants filed a motion for partial summary judgment on the limited issue of
whether Washington Mutual was liable for the representations made by Grist to Bill Wilson and
Steve Holder. The trial court set the summary judgment motion for hearing on July 6, 2001. 
            On June 12, 2001, Washington Mutual filed a motion for revision of the scheduling order
because it had been unable to depose the representatives of Wil-Roye and Renewable. Without an
opportunity to depose these parties, Washington Mutual’s counsel believe that the scheduled
mediation would be futile, and further, other dates in the scheduling order were “keyed off” of the
mediation date. Washington Mutual proposed dates for the various deadlines. Appellants opposed
the extension of the deadlines. The trial court did not immediately rule on the motion. Washington
Mutual did not file a summary judgment response but instead, on June 29, 2001, filed a motion for
continuance of the summary judgment hearing based on its inability to obtain the transcript of a
deposition and inability to depose Steve Holder. The trial court conducted a hearing on the motion
for continuance held on July 3 but it was not recorded by the court reporter. Appellants assert that
the trial court orally denied the motion for continuance but rescheduled the summary judgment
hearing for July 5. On July 5, Mr. Kerr notified the parties and the trial judge that he had suffered
chest pains on July 4 and could not continue as counsel in the case. While the record does not
contain a written order either granting or denying the motion for continuance, it is undisputed that
the summary judgment hearing was not held on either July 5 or July 6. The trial court stated in a
subsequent letter ruling that it had granted the motion for continuance.
            On July 26, 2001, Washington Mutual filed a motion for cancellation of the scheduling order
and all existing settings and deadlines due to Mr. Kerr’s illness and the need to substitute counsel. 
Once again, Appellants opposed the motion. The trial court set the latter motion and others for
hearing on August 23, 2001, less than three weeks before the schedule trial date. Following the
hearing, the court entered a letter order stating:
The completion of this case by a fair trial to both sides is a difficulty not easily
resolved. Changing the existing scheduling order is unfair to Plaintiffs, but
maintaining it in place is unfair to the Defendant. Simply moving the trial date to a
preferential setting on the Court’s docket cannot be accomplished during the
remaining four months of the year because, except for the week of Thanksgiving and
the week before Christmas, there are specially set cases every week, including a case
behind this one on September 10.
 
The medical problems of Mr. Kerr are regrettable but are so serious that he cannot
try this lawsuit, and considering the law of this state, I believe the Court must extend
the trial date and the existing deadlines. If both attorneys for Plaintiffs had become
similarly incapacitated, the adjustments made by the Court would have been the
same. 

The court went on to establish pertinent deadlines, including a January 4, 2002 date for hearing all
summary judgment motions. On September 14, 2001, Washington Mutual filed a notice of
substitution of counsel. Even though it missed the original deadline for filing a summary judgment
response, Washington Mutual filed a timely response prior to the re-scheduled hearing date.
            Appellants argue that there is no evidence to support the trial court’s rescheduling of the
summary judgment hearing and the amendment of the scheduling order due to Mr. Kerr’s illness. 
With regard to the trial court’s decision to re-schedule the summary judgment hearing scheduled for
July 6, Appellants note, with no small amount of sarcasm, that it is understandable opposing counsel
could have suffered some anxiety on July 4 after he missed the deadline for filing a summary
judgment response and the trial court denied his motion for continuance on July 3.
            The grant or denial of a motion for continuance is within the sound discretion of the trial
court. See Tenneco, Inc. v. Enterprise Products Company, 925 S.W.2d 640, 647 (Tex. 1996);
Villegas v. Carter, 711 S.W.2d 624, 626 (Tex. 1986). The trial court’s ruling will not be disturbed
unless the record shows a clear abuse of discretion. Villegas, 711 S.W.2d at 626. We make this
determination by reviewing the record. In this case, however, there was no record made of the July
3 hearing or the July 5 conferences between the trial court and counsel. Without a record of the
evidence presented to the trial court, we must presume that the evidence supports the ruling. Roob
v. Von Beregshasy, 866 S.W.2d 765, 767 (Tex.App.--Houston [1st Dist.] 1993, writ denied); Salley
v. Houston Lighting & Power Co., 801 S.W.2d 230, 232 (Tex.App.--Houston [1st Dist.] 1990, writ
denied). No abuse of discretion is shown. 
            We turn next to Appellants’ argument that the trial court abused its discretion by amending
the scheduling order and extending those deadlines which had already passed. Rule 166 of the Texas
Rules of Civil Procedure relates to pretrial conferences. It provides for an order to be made at the
pretrial conference hearing, and that “such order when issued shall control the subsequent course of
the action, unless modified at the trial to prevent manifest injustice.” Tex.R.Civ.P. 166; Ocean
Transport, Inc. v. Greycas, Inc., 878 S.W.2d 256, 262 (Tex.App.--Corpus Christi 1994, writ denied). 
Rule 166 recognizes the fundamental rule that a trial court has the inherent right to change or modify
any interlocutory order or judgment until the time the judgment on the merits in the case becomes
final. Ocean Transport, 878 S.W.2d at 262.
            Appellants argue that Washington Mutual failed to present any evidence at the August 23,
2001 hearing to show that counsel had suffered incapacitating health problems and could not
continue as counsel. Mr. Kerr appeared at the August 23 hearing on behalf of Washington Mutual. 
Robert Cohan of Jackson and Walker attended the hearing and announced to the court that his firm
was willing to take on the case but would need time to prepare for trial. Mr. Cohan expressly told
the trial court that his firm would not accept representation of Washington Mutual if the trial setting
were extended by only two or three months and the deadlines which had already passed were not
extended. 
            There were several instances during the hearing when Mr. Kerr’s medical condition was
discussed by not only the parties but also the trial court. First, counsel for Appellants stated that Mr.
Kerr had advised the trial court in early July that he would not be able to continue as counsel. 
Although not under oath, Mr. Kerr stated without objection: 
I don’t know what would happen, Judge, if you don’t let Jackson and Walker come
in, I can’t try this case in September. My health is not going to let me try this case
in September. It would not be fair to my client for me to try this case in September. 
I can’t tell you when I would be able to try this case, if ever, and I would be glad to
go into that in detail with you, Judge, but at this point, I couldn’t tell you when I
could try this case. 

The trial judge subsequently stated that he was satisfied that Mr. Kerr’s doctor had said he “cannot
be in this case.” At another point during the hearing, the trial court commented, “I don’t think
anyone would insist that I keep Mr. Kerr in with the medical problem he’s got . . . .” Near the end
of the hearing, Mr. Cohan noted:
I think the Court indicated that it is satisfied with Mr. Kerr’s medical basis, and I
would prefer, if we don’t have to, not to try to put on testimony of that on the record. 
If the Court feels it needs more . . . .

Following Mr. Cohan’s comments, counsel for Appellants agreed to move some scheduled
depositions in order to not put Mr. Kerr’s health at risk. 
            Appellants are correct that Washington Mutual did not formally introduce evidence at this
hearing but it is apparent that the trial court had knowledge of Mr. Kerr’s medical condition. We
note that Appellants did not argue at the hearing that Mr. Kerr should not be allowed to withdraw
due to illness. The issue at the hearing was not whether Mr. Kerr in fact had an incapacitating
medical condition requiring his withdrawal or whether Washington Mutual should be permitted to
obtain new counsel. Rather, the entire dispute focused on whether or not it was fair to change the
scheduling order given that new counsel was coming into the case on the eve of trial. The trial court
attempted to balance the equities by not only re-setting the trial date but extending the pertinent
deadlines for both parties. We conclude that the trial court did not abuse its discretion by modifying
the scheduling order. See Ocean Transport, 878 S.W.2d at 262 (trial court overruled motion to strike
expert witnesses where party designated its expert witnesses well in advance of trial but after the
deadline established by an agreed docket control order; held that trial court impliedly modified
docket control order by denying motion to strike and further held that court did not abuse its inherent
right to change or modify docket control order). Issue Two is overruled.
ADVERSE INFERENCE
            In Issues Three and Four, Appellants complain that the trial court impermissibly drew an
adverse inference from the evidence showing that Steve Holder and Tim Holder exercised their Fifth
Amendment right to remain silent and refused to answer certain questions during their depositions. 
Appellants argue that Texas Rule of Evidence 513 does not permit the court to draw an adverse
inference against them. Washington Mutual responds that Rule 513(c) applies because the Holders
are settling parties and are Appellants’ agents. Additionally, Washington Mutual argues that
Appellants’ offensive use of the privilege lies outside of the intended scope of Rule 513.
            During his deposition, Steve Holder testified at length about many matters, including the
statements made by John Grist to him about Riley Drilling, but he asserted his Fifth Amendment
right against self-incrimination when asked questions relating to the fraudulent invoices. Intending
to introduce portions of Holder’s testimony at trial, Appellants filed a motion in limine seeking to
exclude his assertion of the Fifth Amendment privilege. The trial court ruled that if Appellants
called either Steve or Tim Holder as a witness, the assertion of privilege would be admissible. At
trial, Appellants presented substantial portions of Steve Holder’s deposition testimony. In
accordance with the trial court’s ruling and over the objection of Appellants, Washington Mutual
then read numerous questions which Holder refused to answer. Those questions concerned Holder’s
knowledge of the fraudulent invoices, representations he made to Appellants about the invoices, and
his role in the scheme. 
            Washington Mutual offered Tim Holder’s deposition testimony into evidence, but the trial
court did not admit his invocation of the right against self-incrimination when asked about his
knowledge of and involvement with the fraudulent invoices. In excluding this evidence, the court
ruled that absent clear authority to the contrary it would be unreasonable to draw an adverse
inference against Wil-Roye and Renewable because they had not made offensive use of his
testimony. Washington Mutual, however, included those questions and assertions of privilege in a
bill of exception. Both parties filed post-trial briefs regarding whether adverse inferences could be
drawn from the Holders’ assertion of privilege. Finding in favor of Washington Mutual, the trial
court made the following finding of fact:
KCI and KFG, through Steve Holder, knowingly and intentionally acquired bogus or
fraudulent invoices for Plaintiffs’ account. Both Steve Holder (a witness called by
the Plaintiffs) and his brother, Tim Holder, asserted the Fifth Amendment privilege
against self-incrimination with respect to their knowledge of the fraudulent invoices. 
The court draws the inference from the assertion of the privilege that they knew that
Plaintiffs were being sold fraudulent invoices. Additionally, the direct testimony of
other witnesses corroborates the court’s finding that the Holders and their companies
were involved with or had knowledge of the fraudulent invoices. 

Further, the court stated in a conclusion of law as follows:
 
Rule 513 of the Texas Rules of Evidence prohibits the Court from drawing an
adverse inference against Plaintiffs as a result of the invocation of the Fifth
Amendment privilege against self incrimination by Steve Holder and Tim Holder. 
However, the Rule does not prevent the Court from drawing an inference against (1)
the credibility of Steve and Tim Holder nor (2) the involvement of Steve and Tim
Holder on the issue of causation.

            Rule 513(a) of the Texas Rules of Evidence generally provides that no adverse inference may
be drawn from a claim of a privilege. Tex.R.Evid. 513(a). This general rule, however, does not
apply in a civil proceeding with respect to a party’s claim of the privilege against self-incrimination. 
Tex.R.Evid. 513(c).
            Appellants argue that Rule 513(c) does not apply here because there has been no claim of
privilege by a party, and therefore, Rule 513(a)’s prohibition against an adverse inference must be
given effect. Washington Mutual, on the other hand, asserts that Steve and Tim Holder are “parties”
for purposes of Rule 513 because they are Appellants’ agents. Alternatively, it argues that Rule
513(c) should apply because the Holders are “settling parties.”
            Whether Rule 513(c) applies to a claim of privilege by a party’s agent is one of first
impression in Texas. Rule 513(c) provides that Rule 513(a)’s prohibition against adverse inferences
shall not apply with respect to a party’s exercise of the privilege against self-incrimination, but it 
does not define what constitutes a “party’s claim . . . of privilege.” As a general matter, a party is
one by or against whom a lawsuit is brought. Black’s Law Dictionary 1144 (7th ed. 1999). 
While it would appear at first blush that Rule 513(c) would not apply to a non-party witness’s
assertion of the privilege, one commentator has persuasively argued that “[a]n analogy can be drawn
between admissions by an agent under Rule 801(e)(2) and the ‘silence’ of an agent or person in some
other type of special relationship with a party.” Woods, Invocation of Fifth Amendment Privilege
Against Self-Incrimination as Evidence in a Texas Civil Trial, October 1989 Tex.Bar J. 994, 996. 
Under Texas Rule of Evidence 801(e)(2), a statement is not hearsay if:
Admission by party-opponent. The statement is offered against a party and is:
 
(A) the party’s own statement in either an individual or representative
capacity;
 
(B) a statement of which the party has manifested an adoption or
belief in its truth;
 
(C) a statement by a person authorized by the party to make a
statement concerning the subject;
 
(D) a statement by the party’s agent or servant concerning a matter
within the scope of the agency or employment, made during the
existence of the relationship; or 
 
(E) a statement by a co-conspirator of a party during the course and
in furtherance of the conspiracy.

Tex.R.Evid. 801(e)(2)(D). 

            The statements made by persons designated in Rule 801(e)(2) are admissible against the
named party because of the person’s relationship to the party. Woods, Invocation of Fifth
Amendment Privilege Against Self-Incrimination as Evidence in a Texas Civil Trial, October 1989
Tex.Bar J. 994, 996. Woods reasons that where a witness is so closely related to a party that his
statement would be deemed an admission, it follows that the witness’s refusal to testify or his
invocation of the Fifth Amendment privilege should give rise to an adverse inference of liability. 
Id. The underlying rationale of Rule 801(e)(2) applies with equal vigor to Rule 513(c). Id. Woods
further observes that an application of the “party opponent” definition in Rule 801(e)(2) to the phrase
“party’s claim” in Rule 513 is also consistent with the types of situations in which the Fifth
Amendment privilege might be invoked, namely, suits involving agents, employees, and co-conspirators. Id. at 996-97.
            Federal courts have, on a case-by-case basis, allowed adverse inferences to be drawn when
a non-party witness invokes the privilege against self-incrimination in these situations. Before
discussing these cases, it is important to note that the Federal Rules of Evidence do not contain a
counterpart to our Rule 513. Congress rejected Rules 501-13 proposed by the United States Supreme
Court, including Rule 513(a) which would have precluded the drawing of any adverse inference in
civil or criminal litigation from the assertion of a privilege, and instead adopted Rule 501. See
Brink’s Inc. v. City of New York, 717 F.2d 700, 708 (2nd Cir. 1983)(tracing history leading to
Congress’s enactment in 1974 of Rule 501). In so doing, Congress manifested an affirmative
intention not to freeze the law of privilege. Id., quoting Trammel v. United States, 445 U.S. 40, 47,
100 S.Ct. 906, 911, 63 L.Ed.2d 186 (1980). Its purpose was to provide the courts with the flexibility
to develop rules of privilege on a case-by-case basis and to leave the door open to change. Id. To
this end, Congress adopted Rule 501 which provides that the privilege of a witness is governed by
common law principles as they may be interpreted by the courts of the United States in the light of
reason and experience. See Fed.R.Evid. 501. Shortly after the enactment of Rule 501, the Supreme
Court held in Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976)
that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when
they refuse to testify in response to probative evidence offered against them.
            Within a few years, the federal courts had occasion to address whether adverse inferences can
also be drawn from a non-party’s invocation of the privilege. In Brink’s, an armored car carrier sued
New York City alleging it breached a contract for the collection of parking meter revenues. The City
counterclaimed asserting that Brink’s employees had stolen large sums of money from the parking
meters. The evidence at trial supported the City’s allegation. Several Brink’s employees were
charged with and convicted of larceny and criminal possession of stolen property. The district court
permitted the City to call these former Brink’s employees to the stand where they invoked their Fifth
Amendment privilege. A jury found in favor of the City on its breach of contract and negligence
claims and awarded both compensatory and punitive damages. The Second Circuit affirmed, holding
that the former employees’ refusals to testify were admissible as vicarious admissions of their former
employer. Brink’s, 717 F.2d at 710. The appellate court also found that the claims of privilege had
substantial probative value with respect to showing Brink’s knowledge or negligence. Id.
            In RAD Services, Inc. v. Aetna Casualty and Surety Co., 808 F.2d 271 (3rd Cir. 1986), the
Third Circuit addressed whether a defendant may introduce as substantive evidence the fact that non-party agents of the plaintiff claimed the Fifth Amendment privilege against self-incrimination in
response to questions put to them about their employment and crucial facts at issue in the case. After
being informed that it was violating state environmental regulations by storing fly ash in a
warehouse, RAD illegally disposed of hazardous waste in a Kentucky strip mine. The state of
Kentucky commenced proceedings against RAD and two employees, among others. Faced with a
fine of $10,000 per day while the dust remained in the strip mine, RAD’s directors arranged to
properly dispose of the material and it filed a claim with Aetna for the cost of the clean-up. Aetna
denied coverage under a policy exclusion provision that insured occurrences be neither expected nor
intended. It asserted that RAD had unlawfully expected and intended to dump the hazardous waste. 
RAD then sued Aetna to recover under the policy. At trial, Aetna introduced deposition testimony
of a RAD official and a managing employee invoking their Fifth Amendment privilege and refusing
to answer questions about their involvement with RAD or their present employment status. The
district court instructed the jury that it could, but need not, infer that the witnesses would have
answered Aetna’s questions adversely to RAD. The jury found in favor of Aetna. The Third Circuit
affirmed, finding that the aims supporting the Fifth Amendment privilege applied less forcefully in
civil proceedings, particularly where a non-party had asserted the privilege. RAD Services, 808 F.2d
at 275. The court reasoned that the bases for admitting vicarious admissions under Federal Rule of
Evidence 801(d)(2)(D) also justify informing the factfinder when the corporation’s agent invokes
the Fifth Amendment privilege even though the employment relationship had since been terminated. 
Id. at 275-76.
            The Eighth Circuit has also addressed whether an adverse inference can be drawn from a non-party’s invocation of the Fifth Amendment privilege. In Rosebud Sioux Tribe v. A & P Steel, Inc.,
733 F.2d 509 (8th Cir. 1984), A&P Steel entered into a contract with the Rosebud Sioux Tribe to
develop an irrigation system on the Tribe’s land. All of the Tribe’s land is managed by a
corporation, Tribal Land Enterprises (TLE), and its attorney, Michael Strain, drafted the contract
between the Tribe and A&P. After the agreement was made, A&P hired Strain to serve as
“consultant” on the irrigation project. Strain set up a dummy corporation and funneled payments
from A&P to the Tribe’s chairperson, Edward Driving Hawk, and TLE’s chairperson, Richard Lone
Dog. Alleging fraud, corruption and nepotism, the Tribe sued A&P for fraud, conspiracy, breach
of contract, and breach of warranties. In deposition testimony, Lone Dog flatly contradicted the
allegations in the Tribe’s petition. At trial, the Tribe wished to call Lone Dog to the stand because
he had since been advised to exercise his Fifth Amendment privilege. The trial court prevented the
Tribe from calling Lone Dog as a witness but allowed A&P to introduce his deposition testimony. 
After trial, Lone Dog appeared before a federal grand jury and testified that Strain told him that he
was going to make some money off of the contract and he would be willing to share it with Lone
Dog. Lone Dog agreed and subsequently received several “pay off” checks from Strain. According
to Lone Dog, Strain had advised him to testify falsely at his deposition. The Tribe filed a motion for
new trial based on newly discovered evidence of Lone Dog’s perjury under Federal Rule of Civil
Procedure 60(b). The trial court overruled the motion, but the Eighth Circuit reversed finding that
a new trial should have been granted. Additionally, the court held that the Tribe should have been
allowed to call Lone Dog as a witness at trial. Noting that the policies supporting the Fifth
Amendment apply with significantly less force in a civil proceeding when a non-party witness
testifies, the court held that the Tribe should have been permitted to call Lone Dog as a witness given
that he was a principal actor in a situation fraught with fraud, and A&P utilized his deposition
testimony to establish its defense. Rosebud, 733 F.2d at 521-22.
            Applying the reasoning stated in Woods’ article and the Third Circuit in RAD Services, we
conclude that the rationale for allowing introduction of an agent’s admissions against the principal
under Texas Rule of Evidence 801(d)(2)(D) also justifies admission of evidence showing that the
agent/witness has exercised his Fifth Amendment privilege at least where the questions substantially
relate to a party’s claim or defense. Here, the evidence established that Steve and Tim Holder acted
as Appellants’ agents. The questions Washington Mutual sought to ask and the Holders refused to
answer directly related to its defense. Appellants would have obtained an unfair advantage had they
been able to present favorable portions of Steve Holder’s deposition testimony while precluding
cross-examination. Allowing the fact-finder to draw an adverse inference against Appellants does
not in any way infringe upon the privilege claimed by the Holders. Given this conclusion, it is
unnecessary to address the parties’ other arguments on the issue.
            Even if the trial court erred in drawing adverse inferences from the claim of privilege by a
non-party, other evidence established that the Holders had knowledge of or were involved with the
fraudulent invoices sold to Appellants. Thus, the trial court could have concluded, independent of
their claims of privilege, that the witnesses lacked credibility. There is also substantial evidence that
Appellants’ damages were caused by the fraudulent invoice scheme and the negligence of KCI and
KFG, not by any negligence on the part of the Bank. Consequently, error, if any, did not cause the
rendition of an improper judgment. See Tex.R.App.P. 44.1(a)(1). Issues Three and Four are
overruled.
GRIST’S STATEMENTS
            In Issue Five, Appellants challenge the factual sufficiency of the evidence supporting the trial
court’s determination that Grist’s representation that Riley Drilling would be a good factoring client 
was a negligent misrepresentation, but was not made fraudulently or with an intent to deceive. In
arguing that the misrepresentation was made with the knowledge that it was false, Appellants point
to the evidence showing that Grist was aware of Riley Drilling’s financial problems.
Standard of Review
            In a bench trial, factual and legal sufficiency challenges to the trial court’s findings of fact
are reviewable under the same standards that are applied in reviewing evidence supporting a jury’s
answer. Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994); Elias v. Mr. Yamaha, Inc., 33
S.W.3d 54, 62 (Tex.App.--El Paso 2000, no pet.). Where a party challenges the factual sufficiency
of a failure to find on an issue upon which that party bears the burden of proof, the party must
demonstrate that the adverse finding is against the great weight and preponderance of the evidence.
Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983); Gonzalez v. El Paso Hospital District, 940
S.W.2d 793, 796 (Tex.App.--El Paso 1997, no pet.). A factual sufficiency point requires us to
examine all of the evidence in determining whether the finding in question is so against the great
weight and preponderance of the evidence as to be manifestly unjust. In re King’s Estate, 150 Tex.
662, 244 S.W.2d 660 (1951); Gonzalez, 940 S.W.2d at 796. We will not substitute our own
conclusions for those of the jury; rather if competent evidence of probative force supports the
finding, we will sustain it. Gonzalez, 940 S.W.2d at 796. We will not interfere with the jury’s
resolution of conflicts in the testimony, nor pass on the credibility of the witnesses. Gonzalez, 940
S.W.2d at 796.
The Elements of Fraud and
the Trial Court’s Findings

            In order to prevail on their fraud claim, Appellants had the burden to prove that (1) MAB
made a material representation that was false; (2) it knew the representation was false or made it
recklessly as a positive assertion without any knowledge of its truth; (3) it intended to induce
Appellants to act upon the representation; (4) Appellants actually and justifiably relied upon the
representation; and (5) thereby suffered injury. See Ernst & Young, L.L.P. v. Pacific Mut. Life Ins.
Co., 51 S.W.3d 573, 577 (Tex. 2001). The trial court found that Grist made one misrepresentation: 
“By stating or implying that Riley Drilling would be a good factoring customer, John Grist made a
negligent misrepresentation.” But the court further found that this misrepresentation “was not made
fraudulently or with an intent to deceive.” From these findings, the trial court concluded that
Appellants did not establish their fraud claim because the evidence did not establish that Grist knew
his statement to Bill Wilson was false or that it was made recklessly without any knowledge of its
truth and as a positive assertion.
Review of the Evidence
            At the time he recommended Riley Drilling as a factoring client, Grist knew that Riley
Drilling had cash flow problems and had a history of making late payments on its notes. In May
1995, Riley Drilling asked MAB for an additional line of credit in the amount of $250,000 to cover
cash flow shortages for payroll and timely note payments while waiting to collect accounts
receivable in the amount of $478,535. Grist viewed Riley Drilling as a company whose rapid growth
had outpaced its cash reserves. But Grist also believed that Riley Drilling’s prospects for the future
were positive. In November 1995, Riley Drilling submitted a financial statement to MAB showing
that it had generated over $4 million in drilling revenues with a profit of $378,852. Its rigs were
fully utilized and future prospects were promising. At trial, Grist explained that he considered Riley
Drilling a “good” bank customer but he qualified his characterization by noting that it was also a
“high maintenance” customer given its history of slow payments. He had limited experience in
factoring and intended that Holder would conduct his own credit investigation and determine
whether Riley Drilling would be a “good fit” for his factoring company. MAB benefitted from the
factoring relationship which developed between Riley Drilling and Appellants because Riley Drilling
paid off its accounts receivable loan. By the same token, Appellants made a substantial profit
factoring Riley Drilling’s invoices until at least April 1996. All of the unpaid invoices on which
Appellants’ based their claims were dated after October 1996.
            Grist made his recommendation although he had little factoring expertise. His knowledge
of Riley Drilling’s financial condition would not compel a conclusion that it necessarily would be
a poor factoring customer. Companies with poor cash flow often utilize factoring to improve
liquidity. While Grist’s recommendation was negligent, the trial court’s determination that Grist did
not make the misrepresentation with knowledge of its falsity or without knowledge of its truth is not
against the great weight and preponderance of the evidence. Issue Five is overruled.
SPECIAL RELATIONSHIP
            In Issue Six, Appellants contend that the trial court erred in failing to find that evidence
existed of a special relationship between Appellants and Washington Mutual which created a duty
of good faith and fair dealing. Appellants also assert that the trial court erred “in reversing its prior
decision that Appellants had a legally recognizable ‘special relationship’ with MAB.”
            By “prior decision,” Appellants refer to a letter written by the trial judge on June 10, 2002
announcing his decision that Appellants were not entitled to recover on their causes of action. The
letter set forth “some but not all of the reasons for the conclusion reached.” To the extent Appellants
complain that the trial court’s findings of fact and final judgment differ from the reasoning stated
in the letter, their argument is without merit. The letter, which was written months prior to the entry
of final judgment and the court’s findings of fact, is not competent evidence of the trial court’s basis
for judgment nor is it a finding of fact as contemplated by the Texas Rules of Civil Procedure. See
Cherokee Water Company v. Gregg County Appraisal District, 801 S.W.2d 872, 878 (Tex. 1990).
            In one of its conclusions of law, the trial court determined that:
The duty of good faith and fair dealing does not apply to the facts of this case. ‘A
claim for breach of duty of good faith and fair dealing is a tort action that arises from
an underlying contract.’ Bank One, Texas N.A. v. Stewart, 967 S.W.2d 419, 441
(Tex.App.--Houston [14th Dist.] 1998, pet. denied). None of the Plaintiffs’ claims
arise out of any contract between Plaintiffs and MAB. Plaintiffs’ factoring losses --
the only injury claimed here -- did not arise out of any contract between the Plaintiffs
and MAB. 

Appellants argue that MAB owed them the duty of good faith and fair dealing because a special
relationship existed between the parties such that MAB owed them a duty to place Appellants’
interests above its own. They allege that MAB breached this duty by failing to disclose information
which it knew about Riley Drilling, Denny Allen, and SPI.
            Historically, Texas law has recognized that certain relationships give rise to a “fiduciary”
duty as a matter of law. Crim Truck & Tractor Co. v. Navistar International Transportation Corp.,
823 S.W.2d 591, 593-94 (Tex. 1992), citing e.g., Kinzbach Tool Co. v. Corbett-Wallace Corp., 138
Tex. 565, 160 S.W.2d 509, 513 (1942)(principal/agent) and Johnson v. Peckham, 132 Tex. 148, 120
S.W.2d 786, 787 (1938)(partners). Although a fiduciary duty encompasses at the very minimum a
duty of good faith and fair dealing, the converse is not true. Crim Truck, 823 S.W.2d at 594. 
Contrary to Appellants’ interpretation, the duty of good faith and fair dealing merely requires the
parties to “deal fairly” with one another and does not encompass the often more onerous burden that
requires a party to place the interest of the other party before his own, often attributed to a fiduciary
duty. Id.
            In recent years, the Texas Supreme Court has categorized certain relationships as “special
relationships,” giving rise to a tort duty of good faith and fair dealing. See, e.g., Aranda v. Insurance
Co. of N. Am., 748 S.W.2d 210, 212-13 (Tex. 1988)(worker’s compensation carrier-injured
employees); Arnold v. National County Mut. Fire Ins. Co., 725 S.W.2d 165, 167 (Tex.
1987)(insurer-insured). This duty may arise from the express language of a contract or from the
nature of the relationship between the parties to the contract, where it entails unequal bargaining
power and the likelihood of abuse by the more powerful party. Lovell v. Western National Life Ins.
Co., 754 S.W.2d 298, 302 (Tex.App.--Amarillo 1988, writ denied). The Supreme Court has
expressly rejected the contention that an implied duty of good faith and fair dealing exists in every
contract. English v. Fischer, 660 S.W.2d 521, 522 (Tex. 1983). Indeed, the duty of good faith and
fair dealing does not arise in ordinary commercial transactions. Formosa Plastics Corp. USA v.
Presidio Eng'rs & Contrs., Inc., 960 S.W.2d 41, 52 (Tex. 1998). 
            Citing our opinion in Dominguez v. Brackey Enterprises, Inc., 756 S.W.2d 788 (Tex.App.--El
Paso 1988, writ denied), Appellants argue that the duty of good faith and fair dealing can arise
outside of a contractual relationship. Dominguez, however, involved a claim for damages caused
by a fiduciary’s breach of duties. Because Appellants did not plead a cause of action for breach of
fiduciary duties, Dominguez does not support their argument.
            Appellants also contend that the duty of good faith and fair dealing arose out of their
relationship with MAB as bank customers and shareholders and because they were parties to various
contracts, including deposit and borrowing agreements. The relationship between a bank and its
customers does not usually create a special or fiduciary relationship. Farah v. Mafrige & Kormanik,
P.C., 927 S.W.2d 663, 675 (Tex.App.--Houston [1st Dist.] 1996, no writ); Manufacturers Hanover
Trust Co. v. Kingston Inv. Corp., 819 S.W.2d 607, 610 (Tex.App.--Houston [1st Dist.] 1991, no
writ). But see Plaza National Bank v. Walker, 767 S.W.2d 276, 277-78 (Tex.App.--Beaumont 1989,
writ denied)(citing Arnold and holding that a bank and its depositors enjoyed the type of special
relationship giving rise to duties of good faith and fair dealing).


 Likewise, the relationship between
a borrower and lender is usually neither a fiduciary relationship nor a special relationship. Farah,
927 S.W.2d at 675; Manufacturers Hanover Trust, 819 S.W.2d at 610; see Fed. Deposit Ins. Corp.
v. Coleman, 795 S.W.2d 706, 708-09 (Tex. 1990)(the mere relationship of debtor and creditor is not
sufficiently special to impose a duty of good faith upon its parties); see also Thigpen v. Locke, 363
S.W.2d 247, 253 (Tex. 1962)(debtor-creditor relationship involving personal loans from a bank
officer did not create fiduciary relationship). When a special relationship between a borrower and
lender has been found, it has rested on extraneous facts and conduct, such as excessive lender control
over, or influence in, the borrower’s business activities. Farah, 927 S.W.2d at 675; Greater S.W.
Office Park, Ltd. v. Texas Commerce Bank National Association, 786 S.W.2d 386, 391
(Tex.App.--Houston [1st Dist.] 1990, writ denied). To show a special relationship, Appellants point
to evidence that they were bank customers, had substantial deposits in the bank, were shareholders
in the bank, and they had often sought the bank’s advice on various matters. These facts do not
demonstrate that MAB had excessive control over or influence in Appellants’ business activities. 
Because the trial court did not err by failing to find the existence of a special relationship, we
overrule Issue Six.
SCOPE OF KCI AND KFG’S AGENCY
            In Issue Seven, Appellants assert that the trial court erred in determining that KCI and KFG
were general agents of Appellants. The trial court specifically found that KCI acted as agent for
Appellants for the acquisition of the invoices as well as for the day to day operation of the factoring
business. Appellants complain that the trial court’s June 10, 2002 letter ruling did not contain such
a finding, and therefore, it cannot be a basis for the trial court’s judgment. The letter, which was
written months prior to the entry of final judgment and the court’s findings of fact, is not competent
evidence of the trial court’s basis for judgment. See Cherokee Water Company, 801 S.W.2d at 878. 
Therefore, the trial court’s failure to state a finding in the letter is irrelevant to the judgment and
subsequent findings.
            Appellants further argue that the trial court’s finding does not support a conclusion that either
KCI or KFG were authorized to do more than purchase accounts receivable invoices on behalf of
Appellants from pre-approved customer lists and to submit them to Appellants to be paid at mutually
agreeable discounts or that they were authorized to purchase erroneous or “bad” accounts receivable
invoices. Because they do not provide any legal analysis or authority supporting their argument, it
is waived. See Tex.R.App.P. 38.1(h)(brief must contain clear and concise argument for contentions
made, with appropriate citations to authorities and to the record); City of Midland v. Sullivan, 33
S.W.3d 1, 10 n.6 (Tex.App.--El Paso 2000, pet. dism’d w.o.j.)(appellant failed to brief complaint
and thus waived appellate review of issue). Issue Seven is overruled.
JUSTIFIABLE RELIANCE
            In Issue Nine, Appellants maintain that the trial court erred by determining that they did not
rely on Grist’s representations.


 While it is unclear from their brief, we assume Appellants intend
to challenge the factual sufficiency of the evidence supporting this finding.
            The trial court correctly determined that in order to prevail on their fraud claim, Appellants
had the burden to prove that (1) MAB made a material representation that was false; (2) it knew the
representation was false or made it recklessly as a positive assertion without any knowledge of its
truth; (3) it intended to induce Appellants to act upon the representation; and (4) Appellants actually
and justifiably relied upon the representation and thereby suffered injury. [Emphasis added]. See
Ernst & Young, L.L.P., 51 S.W.3d at 577; see also TCA Building Co. v. Entech, Inc., 86 S.W.3d 667,
674 (Tex.App.--Austin 2002, no pet.)(noting that justifiable reliance is an essential element of a
common law fraud action). The defrauded party must exercise ordinary care for the protection of
his own interests and is charged with knowledge of all facts which would have been discovered by
a reasonably prudent person similarly situated. See Thigpen, 363 S.W.2d at 252.
            The trial court found as follows:
20. By April 1996, Plaintiffs were no longer relying on any statements made by John
Grist, but instead were relying on the knowledge they had gained through their
factoring and from other business dealings with Riley Drilling and, later, with SPI. 
Plaintiffs were also relying on the expertise and advice of Steve Holder and KCI to
sustain and expand the factoring business. 
 
21. After April 1996, Plaintiffs could not justifiably or reasonably rely on any
statements made by John Grist because of the knowledge they had obtained since the
statements. 

            The trial court’s reference to April 1996 is significant because by that time Riley Drilling had
become a subsidiary of SPI and had substantially changed since Grist recommended it as a factoring
client. Holder had begun working for SPI as vice president in charge of acquisitions and Riley
Drilling leased its drilling rigs from IDE, a company in which Wilson owned a 50 percent interest. 
Thus, Appellants’ principals and agents, through their business dealings and affiliation with Riley
Drilling, had greater access to its financial information than did MAB. Further, Appellants had been
factoring Riley Drilling’s invoices at a profit for several months when they decided not only to
continue factoring Riley Drilling’s invoices but to expand their involvement with Riley Drilling. 
The trial court’s determination that Appellants could not justifiably rely on Grist’s recommendation
after April 1996 is not against the great weight and preponderance of the evidence. Issue Nine is
overruled.
CAUSATION
            In their eighth issue, Appellants contend that the trial court erred by determining that MAB’s
misrepresentation did not cause Appellants’ losses. As was the case with Issue Nine, we assume
Appellants intend to challenge the factual sufficiency of the evidence supporting this finding.
            The trial court correctly concluded that in order for Appellants to prevail on their fraud claim,
they were required to show that they suffered injury as a result of their reliance on MAB’s
representation. See McCulley Fine Arts Gallery, Inc. v. “X” Partners, 860 S.W.2d 473, 483
(Tex.App.--El Paso 1993, no writ)(holding that one of the essential elements of fraud is a showing
of damages suffered due to the fraud ). The trial court specifically determined that the evidence did
not establish that Appellants suffered injury as a result of their reliance on Grist’s statement after
April 1996. Given the court’s determination that Appellants did not justifiably rely on Grist’s
statement after April 1996, the representation could not have caused Appellants’ injury. Further, the
evidence supports the trial court’s determination that Appellants’ losses were caused by the criminal
and fraudulent actions of Steve Holder, Tim Holder, Denny Allen, Riley Drilling and SPI. The
evidence also supports the court’s conclusion that the negligence of KCI and KFG, shown by their
failure to follow the most basic practices and procedures used in the factoring industry, caused
Appellants’ losses. Issue Eight is overruled. Having overruled each issue presented on appeal, we
affirm the judgment of the trial court.

June 3, 2004                                                                
                                                                                    ANN CRAWFORD McCLURE, Justice

Before Panel No. 4
Barajas, C.J., Larsen, and McClure, JJ.