COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-428-CV

 

 

IN THE INTEREST OF D.B.                                                                     

 

 

                                              ------------

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I.  Introduction








Appellant David B. appeals the trial court=s
judgment terminating his parental rights to his son, D.B.[2]  In six points, David argues that the trial
court abused its discretion by denying his motion for continuance and that the
evidence is legally and factually insufficient to support the trial court=s
judgment terminating his parental rights. 
Because the trial court did not abuse its discretion by denying David=s motion
for continuance and because the record demonstrates that termination of David=s
parental rights was proper under section 161.001, we will affirm.

II.  Factual Background

A.     2006 CPS Referral

On August 30, 2006, Child Protective Services
(CPS) received a referral for neglectful supervision and physical neglect of
D.B. by David.  D.B. was two years old at
the time and lived with David at David=s mother=s
house.  The caller initiating the
referral indicated that (1) D.B.=s mother
had been released from prison, was on drugs, and had access to D.B.; (2) D.B.
was left in the primary care of his paternal grandmother, who had difficulty
caring for him because she was an insulin-dependent diabetic and had other
severe medical problems; (3) David took the grandmother=s Social
Security check, allegedly to buy food, but there was never any food in the
house; (4) the home had trash strewn about and was infested with roaches; and
(5) D.B. had run away from his grandmother, and due to her disability, she had
trouble catching him. 








Approximately a week after the referral came in,
CPS investigator Jennifer Cook went to the home and visited with the
grandmother and D.B.  Although D.B.
appeared of average height and weight and did not have any marks or bruises, he
was not verbal.  The house was sparsely
furnished; D.B. slept on a cushion on the floor, and during the interview, the
grandmother sat at a card table with one chair. 
Cook was concerned about the grandmother=s
ability to care for D.B. because she did not appear to be in good health; had
not bathed; wore soiled clothing; had extremely red eyes, one of which appeared
to have an infection; had very swollen legs; and had a hard time walking and
sitting.[3]


When Cook made contact with David later that day,
he denied all of the allegations.  He
said that he did not leave D.B.=s mother
alone with D.B.  David stated that he
could provide for D.B. because he was employed with the Como Community Center
and received disability benefits because of his arthritis, asthma, and bipolar
disorder.  David also stated that he felt
that his mother, D.B.=s grandmother, could adequately
care for D.B. 








Cook instructed David to submit to a drug test,
which he agreed to do.  However, David
did not go through with the test.  He
admitted that he had smoked marijuana within the past six months and said that
the test would come back positive for another drug.  Cook advised David that he still needed to
take the drug test.  On September 13,
2006, David told Cook that he still had not taken the drug test and that his
last day of work would be September 15 because his services were no longer
needed at the community center.  When David
ultimately submitted to a hair follicle test on September 15, 2006, the results
came back positive for cocaine. 

Cook and her supervisor made a home visit on
September 16, 2006.  David appeared
unable to comprehend the conversation that they were having, and they suspected
that he was under the influence of some type of substance.  During that visit, David agreed to
voluntarily place D.B. with David=s
stepson, Cedric Clark.  Clark had a
criminal charge for possession of marijuana pending against him, so CPS placed
D.B. with Clark=s girlfriend, Tanisha Hodges. 

David contacted CPS in October and scheduled an
appointment to discuss receiving services. 
During that appointment, David mentioned that a niece named Lynette
Taylor wanted to be considered as a placement for D.B.  David said that he was not happy with D.B.=s
current placement because Hodges was not allowing him to have as much access to
D.B. as he wanted. 








After that meeting, David failed to follow
through with a scheduled drug assessment test. 
David and the grandmother apparently had been evicted from the apartment
they were previously living in, and Cook had difficulty locating David.  On November 28, 2006, David called Cook and
told her that he was living in Dallas. 
After that phone call, Cook did not have further contact with David
regarding the August 2006 referral because he did not provide an address or
phone number where he could be reached. 
CPS eventually closed the case for lack of contact with the parents and
disposed of the case as Areason to believe for neglectful
supervision@ of D.B. by David.

B.     2007
CPS Referral

On January 22, 2007, Hodges contacted Cook and
told her that she could no longer care for D.B. 
Cook was not able to contact David or D.B.=s
mother, so D.B. was placed in foster care. 
At the time that D.B. left Hodges=s care,
he had just turned three.  Cook observed
that D.B. never spoke.  Cook said that
D.B. appeared to understand verbal commands and could follow them but did not
speak one word.  Hodges had told Cook
that D.B. liked to be very close to people and that he would need to be
reminded to use the bathroom.  Cook noted
that D.B. played right next to her, that he was unable to tell her when he was
hungry or thirsty, and that he was Adefinitely
very delayed.@ 

Cook ultimately discovered that D.B.=s mother
was in jail on prostitution charges. 
During Cook=s conference with D.B.=s
mother, she learned that David was also in jail.  Cook thereafter visited David in jail and
told him that Hodges could no longer care for D.B. and that he was in foster
care.  David responded that D.B. Amight as
well be left in [foster] care.@ David
did not ask how D.B. was doing or where he was. 
He also told Cook that he was incarcerated for forgery and would be in
jail for at least a year.  








Cook disposed of this new investigation as Areason
to believe for neglectful supervision@ by
David and D.B.=s mother.  Cook stated that a preponderance of the
evidence showed that David had voluntarily placed D.B. with Hodges who could no
longer care for the child, that there were no relatives to care for D.B., that
Hodges had not spoken with either parent in several months, that the voluntary
placement had not received any financial assistance from D.B.=s
parents in order to care for D.B., that both parents were incarcerated at the
time of D.B.=s removal, that D.B.=s mother
had been arrested on charges of prostitution, and that David had been arrested
for forgery.[4]  

C.     David=s
Perspective

David testified at trial and said that D.B. had
lived with him since birth.  David=s mother,
D.B.=s
grandmother, helped with raising D.B. 
D.B.=s mother did not participate in
raising D.B.  








David said that he tried to provide some
financial support for D.B. while he was staying with Hodges; however, he
claimed that his stepson Clark did not come by as he had promised to pick up
the money.  David said he did not know
where Hodges lived, and it never crossed his mind to call CPS to tell them he
had money for Hodges.  After David=s job
ended at Como Community Center, he said that he had worked construction in
Arlington. 

David said that he was not using marijuana and
methamphetamines back in September 2006 but admitted that he was using cocaine
about every two weeks when he got paid. 
He said that he did not take advantage of the drug treatment offered by
CPS because he did not have transportation. 

At the time of trial, David was serving a
one-year sentence in state jail for forgery of his mother=s social
security checks.  David said that he had
also been convicted of robbery, auto theft, and possession of cocaine.  He admitted that he had been arrested on
numerous occasions for tickets.  In
total, David had been arrested over 160 times. 
David admitted that he was not acting in D.B.=s best
interest when he committed the offenses for which he was charged. 








David said that D.B. did not have any
developmental problems and that D.B. played like other children did.  However, David later testified that he had
told Clark that he needed to take D.B. to a speech therapist.  David did not remember who D.B.=s
pediatrician was, but he remembered that D.B. took two naps a day, went to bed
at 9 p.m., loved spaghetti and weenies, and enjoyed riding his Big Wheel bike
and playing at the park.  David also
denied any knowledge of episodes when D.B. would eat until he became sick. 

David said that he had concerns about D.B.=s
staying with Hodges because Hodges would not respond to his questions about how
D.B. was doing.  David said that he had
not seen D.B. in almost two years.  He
admitted that he had not communicated with the caseworker and had not sent D.B.
any letters nor asked to receive photos of D.B. 

While he was in jail, David took CHANGES,
parenting classes, and drug and alcohol classes.  David said that his correspondence from CPS
has indicated that he would be able to work his service plan after he was
released from jail.  David said that when
he is released from jail, he wants to get a job, get stable, and take the
classes that he needs to take to get his son back.  David stated that he loves his son. 

D.     D.B.=s
Outlook








Bolu Odelusi, the ongoing CPS caseworker for D.B.=s case,
testified that when D.B. was placed in foster care, he could not speak, he did
not smile, he did not walk, he did not attach well to others, and he Ahoarded
food.@  CPS moved D.B. from a basic foster home to a
therapeutic foster home to address his delayed developmental issues.  While in therapeutic foster care, D.B.
received occupational, physical, play, and speech therapies and was enrolled in
a preschool for children with disabilities. 
D.B. is thriving in foster care; he is very attached to his foster mom;
he is now speaking; he interacts well with children in the home; and he is
getting much better about not hoarding food.

Odelusi testified that it was not in D.B.=s best
interest for David to be given additional time to work the service plan.  D.B. has several disabilities and  Areally
needs to be in a place where stability is provided.@  Odelusi also testified that it was in D.B.=s best
interest for David=s parental rights to be
terminated because David has an extensive criminal history, including illegal
drug use during the time that he was D.B.=s
primary caregiver; because David placed D.B. in an environment where he was not
properly taken care of; and because David failed to communicate with CPS after
he received a service plan. 

E.     Trial Court=s
Decision

At the conclusion of the termination trial, the
trial court took judicial notice of a ACertificate
of Paternity Registry@ that was on file with the court
indicating that a diligent search of the paternity registry had been made, and
no notice of intent to claim paternity had been located pertaining to D.B.  The trial court thereafter terminated David=s
parental rights to D.B. and included the following in the AOrder of
Termination@:

 

 

 








9.     Termination
of Alleged Biological Father DAVID [B.=s] Parental Rights

 

9.1.  The Court finds by clear and convincing
evidence that, after having waived service of process or being served with
citation in this suit, DAVID [B.] did not respond by filing an admission of
paternity or by filing a counterclaim for paternity or for voluntary paternity
to be adjudicated under chapter 160 of the Texas Family Code before the final
hearing in this suit.

9.2.  The
Court finds by clear and convincing evidence that David [B.] has:

 

9.2.1.        knowingly
placed or knowingly allowed the child to remain in conditions or surroundings
which endanger the emotional or physical well-being of the child; and

 

9.2.2.        engaged
in conduct or knowingly placed the child with persons who engaged in conduct
which endangers the physical and emotional well-being of the child; and

 

9.3.  The
Court also finds by clear and convincing evidence that termination of the
parent-child relationship, if any exists or could exist, between the alleged
father and [D.B.], the child the subject of this suit, is in the best interest
of the child. 

 

This appeal followed.

 

III.  Motion for Continuance








In his first point, David argues that the trial
court abused its discretion by denying his motion for continuance and by
holding the termination trial prior to his release from jail.  Specifically, David complains that he thought
he would be able to work his service plan after his release from jail because
some of the required services were not available in jail.

To determine whether a trial court abused its
discretion, we must decide whether it acted without reference to any guiding
rules or principles; in other words, whether the act was arbitrary or
unreasonable.  Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241B42 (Tex.
1985), cert. denied, 476 U.S. 1159 (1986).  Whether the trial court grants or denies a
motion for continuance is within its sound discretion.  See BMC Software Belg., N.V. v. Marchand,
83 S.W.3d 789, 800 (Tex. 2002); Villegas v. Carter, 711 S.W.2d 624, 626
(Tex. 1986); see also In re E.L.T., 93 S.W.3d 372, 374 (Tex. App.CHouston
[14th Dist.] 2002, no pet.).  The trial
court=s action
in denying a continuance will not be disturbed unless the record discloses a
clear abuse of discretion.  State v.
Wood Oil Distrib. Inc., 751 S.W.2d 863, 865 (Tex. 1988).








A motion for continuance shall not be granted
except for sufficient cause supported by an affidavit, consent of the parties,
or by operation of law.  Tex. R. Civ. P. 251.  If appellant provides no record of the
evidence presented to the trial court, we must presume that the evidence
supports the ruling.  See Wil-Roye
Inv. Co. II v. Wash. Mut. Bank, F.A., 142 S.W.3d 393, 401 (Tex. App.CEl Paso
2004, no pet.); In re Guardianship of Berry, 105 S.W.3d 665, 667 (Tex.
App.CBeaumont
2003, no pet.).

Here, David submitted a verified motion for
continuance, and we have been provided with a record of the evidence presented
to the trial court.  We will therefore
review that evidence and determine whether the trial court abused its
discretion by denying David=s motion
for a continuance. 

The record reveals that at the April 2007 status
review hearing, the trial court found that David 

has reviewed and
understands the service plan and has been advised that unless he is willing and
able to provide the child with a safe environment, even with the assistance of
a service plan, within the reasonable period of time specified in the plan,
his parental and custodial duties and rights may be subject to restriction or
to termination or the child may not be returned to him. [Emphasis added.] 

 

At the time of that hearing, the initial service plan stated that the
permanency goal was AFamily Reunification@ and
that the projected date for achieving permanency was A1/31/08,@ meaning
that David had until January 31, 2008 to complete the services listed on his
plan.  Odelusi testified, however, that a
parent=s
completion of a service plan did not guarantee that a child would be returned
to that parent.








The APermanency
Plan and Permanency Progress Report@
submitted by the case worker on July 12, 2007, repeatedly stated that A[u]pon
return from incarceration, [David] will@ comply
with various provisions.  However, it
also stated that David Ahas not returned any form of
communication to the worker.  It is the
worker=s
assumption that [David] is not doing any type of services while incarcerated.@  Two weeks later, on July 26, 2007, the trial
court held a permanency hearing and entered an order finding that David had Anot
demonstrated adequate and appropriate compliance with the service plan,@ setting
the case for trial on November 19, 2007, and setting a dismissal date of
January 29, 2008 pursuant to family code section 263.306(11).  See Tex.
Fam. Code Ann. ' 263.306(11) (Vernon 2002).  Prior to the hearing date, on November 8,
2007, the case worker submitted a revised permanency plan, which reflected that
family reunification was no longer the permanency goal and that adoption by a
relative was being pursued. 








David filed a motion for continuance, requesting
an opportunity to complete the services in his plan.  David, however, had not even begun his
service plan (except to the extent, if any, that the parenting, drug and alcohol
classes he took in jail satisfied any aspect of the plan), which required him
to participate in parenting classes through the Child and Family Guidance
Center; demonstrate the ability to participate in the rearing of D.B. while he
was in the possession of the foster home caregivers; maintain stable housing,
employment, and transportation; undergo a drug/alcohol assessment through
Resource Recovery, including random urinalyses; maintain a visitation schedule
with D.B.; participate in and follow the recommendations of the individual
counseling offered through Positive Influence; undergo a psychological
evaluation through Positive Influence; comply with the requirements of his
probation and his probation officer; and maintain contact with the CPS worker.  David could not have started and completed
all of the required services between his December 21, 2007 expected release
date and the completion date listed in the service planCJanuary
31, 2008.  And David=s motion
for continuance failed to allege exactly how long he thought it would take him
to complete these various services. 
Moreover, during his months in jail, David had not communicated with the
CPS case worker or responded to her correspondence.

The record demonstrates that David had
approximately four months= notice of the trial setting but
waited to file a motion for continuance until the morning that the case was
called for trial.  Although David knew
his expected release date, he did not communicate it to his caseworker or move
for a continuance sooner to enable him a better opportunity to start and
complete all the services between his December 21, 2007 release date and the
January 31, 2008 compliance date set forth in the initial service plan.








Additionally, David=s motion
for continuance and his arguments in support of the motion do not claim that he
was unprepared for trial.  David has thus
failed to demonstrate that the trial court abused its discretion by denying his
motion for continuance.  See E.L.T.,
93 S.W.3d at 375.  We therefore overrule
David=s first
point.

IV.  Findings Supporting Termination

A.     Section 161.002 Finding

Although David raises legal and factual
sufficiency challenges to the trial court=s
findings that he knowingly placed D.B. with persons or allowed D.B. to remain
in conditions that endangered D.B.=s
physical or emotional well-being, he did not challenge the trial court=s
finding that his rights should be terminated under section 160.002(b)(1). TDFPS
argues that the trial court=s
judgment should be affirmed based on this unchallenged finding. 








Section 161.002(b)(1) provides that A[t]he
rights of an alleged father may be terminated if: (1) after being served with
citation, he does not respond by timely filing an admission of paternity or a
counterclaim for paternity under Chapter 160.@  Tex.
Fam. Code Ann. ' 161.002(b)(1) (Vernon Supp.
2007).  Subsection (b)(1) thus allows a
trial court to summarily terminate the rights of an alleged biological father
who does not assert his paternity by filing an admission of paternity or a counterclaim
for paternity.  Id.; see Phillips
v. Tex. Dep=t of Protective & Regulatory
Servs., 25 S.W.3d 348, 357 (Tex. App.CAustin
2000, no pet.).  If the alleged father
does file an admission of paternity or a counterclaim for paternity, then
subsection (a) allows the alleged biological father Ato stave
off summary termination of his rights and require[s TDFPS] to meet the high
burden of proof found in section 161.001@ of the
Texas Family Code.  Phillips, 25
S.W.3d at 357; see Tex. Fam. Code
Ann. ' 161.002(a).  Therefore, by filing an admission or
counterclaim for paternity, the alleged father is given the right to require
TDFPS to prove by clear and convincing evidence that he engaged in one of the
types of conduct listed in section 161.001(1) and that termination is in the
best interest of the child.  Phillips,
25 S.W.3d at 357.  If the alleged father,
however, does not file such an admission or counterclaim, then subsection (b)
permits the trial court to summarily terminate his parental rights without
TDFPS=s having
to meet the high burden of proof found in section 161.001.  See Tex.
Fam. Code Ann. ' 161.002(a); Phillips, 25
S.W.3d at 357.








TDFPS in its brief characterizes the record as Afactually
confusing regarding this issue,@ and our
review of the record confirms this. 
After David was served, he filled in the blanks on a preprinted ARequest
for Counsel,@ which stated that he was Aa parent
of the child named above.@ 
David=s appointed counsel thereafter
filed a general denial that did not mention paternity.  Following the April 2007 status hearing, the
trial court ordered a paternity test; however, no paternity test results appear
in the record.  During the termination
trial, David testified that he is D.B.=s
father, that he had raised D.B. from birth, and that he remained the person
responsible for D.B.; no contrary evidence was admitted.  At the end of the trial, the trial court took
judicial notice, without objection, that Athere is
a Certificate of Paternity Registry Search on file in this case indicating that
a diligent search of the Paternity Registry has been made, and no notice of
intent to claim paternity has been located concerning the child the subject of
this suit.@ 









Because David failed to challenge this ground on
appeal, TDFPS requests that we affirm the termination of his parental rights
based solely on this ground.  See In
re A.D., No. 04-02-00310-CV, 2002 WL 31829510, at *2 (Tex. App.CSan
Antonio Dec. 18, 2002, no pet.) (not designated for publication) (affirming
termination because appellant, one of multiple alleged biological fathers,
failed to file an admission of paternity or counterclaim for paternity under
section 161.002(b)(1)).  However, we
question the applicability of section 161.002 based on the factual background
described above and based on the limited case law addressing this issue.  Therefore, in the interest of justice and
because we are required to strictly construe involuntary termination statutes
in favor of the parent, we will proceed to analyze the sufficiency of the
evidence to support the trial court=s other
section 161.001 findings.  See Holick
v. Smith, 685 S.W.2d 18, 20B21 (Tex.
1985); In re E.M.N., 221 S.W.3d 815, 820 (Tex. App.CFort
Worth 2007, no pet.).

B.     Section 161.001 Findings

In his second through sixth points, David argues
that there is legally and factually insufficient evidence to prove that he
violated section 161.001(1)(D) and (E) and that termination is in D.B.=s best
interest.  TDFPS responds that the
evidence is legally and factually sufficient to support the trial court=s
findings. 

1.     Standard of Review 

In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the petitioner
must establish one ground listed under subdivision (1) of the statute and must
also prove that termination is in the best interest of the child.  TEX. FAM. CODE ANN. ' 161.001
(Vernon Supp. 2007); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987).








Termination of parental rights is a drastic
remedy and is of such weight and gravity that due process requires the
petitioner to justify termination by clear and convincing evidence.  TEX. FAM. CODE ANN. ''
161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls between the
preponderance standard of ordinary civil proceedings and the reasonable doubt
standard of criminal proceedings.  In
re G.M., 596 S.W.2d 846, 847 (Tex. 1980); In re C.S., 208 S.W.3d 77,
83 (Tex. App.CFort Worth 2006, pet.
denied).  It is defined as the Ameasure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.@ 
Tex. Fam. Code Ann. ' 101.007
(Vernon 2002).

In reviewing the evidence for legal sufficiency
in parental termination cases, we must determine whether the evidence is such
that a fact-finder could reasonably form a firm belief or conviction that the
grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005). 
We must review all the evidence in the light most favorable to the
finding and judgment.  Id.  This means that we must assume that the
fact-finder resolved any disputed facts in favor of its finding if a reasonable
fact-finder could have done so.  Id.  We must also disregard all evidence that a
reasonable fact-finder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable fact-finder could and disregard contrary evidence unless a
reasonable fact-finder could not.  Id.








We must therefore consider all of the evidence,
not just that which favors the verdict. 
Id.  But we cannot weigh
witness credibility issues that depend on the appearance and demeanor of the
witnesses, for that is the fact-finder=s
province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the fact-finder=s determinations
as long as they are not unreasonable.  Id.
at 573.

In reviewing the evidence for factual
sufficiency, we must give due deference to the fact-finder=s findings
and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a fact-finder could reasonably form a firm conviction or
belief that the parent violated the environmental endangerment or course of
conduct endangerment provisions found in section 161.001(1)(D) and (E) and that
the termination of the parent=s
parental rights would be in the best interest of the child.  In re C.H., 89 S.W.3d 17, 28 (Tex.
2002).  If, in light of the entire
record, the disputed evidence that a reasonable fact-finder could not have
credited in favor of the finding is so significant that a fact-finder could not
reasonably have formed a firm belief or conviction in the truth of its finding,
then the evidence is factually insufficient. 
H.R.M., 209 S.W.3d at 108. 

 

 








2.     Endangerment Law and Analysis








Endangerment means to expose to loss or injury,
to jeopardize.  Boyd, 727 S.W.2d
at 533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.CFort
Worth 2003, no pet.); see also In re M.C., 917 S.W.2d 268, 269 (Tex.
1996).  To prove endangerment under
subsection (D), TDFPS had to prove that David (1) knowingly (2) placed or
allowed D.B. to remain (3) in conditions or surroundings that endangered his
physical or emotional well‑being.  See
Tex. Fam. Code Ann. '
161.001(1)(D).  Under section 161.001(1)(E),
the relevant inquiry is whether evidence exists that the endangerment of D.B.=s
physical well‑being was the direct result of David=s
conduct, including acts, omissions, or failures to act.  J.T.G., 121 S.W.3d at 125; see Tex. Fam. Code Ann. '
161.001(1)(E).  Additionally, termination
under section 161.001(1)(E) must be based on more than a single act or
omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.  J.T.G., 121
S.W.3d at 125; see Tex. Fam. Code
Ann. ' 161.001(1)(E).  However, it is not necessary that the parent=s
conduct be directed at the child or that the child actually suffer injury.  Boyd, 727 S.W.2d at 533; J.T.G.,
121 S.W.3d at 125.  The specific danger
to the child=s well‑being may be
inferred from parental misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.CFort
Worth 2004, pet. denied).  To determine
whether termination is necessary, courts may look to parental conduct occurring
both before and after the child=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.).

Stability and permanence are paramount in the
upbringing of children.  See In re
T.D.C., 91 S.W.3d 865, 873 (Tex. App.CFort
Worth 2002, pet. denied).  A fact-finder
may infer from past conduct endangering the well‑being of the child that
similar conduct will recur if the child is returned to the parent.  See In re D.L.N., 958 S.W.2d 934, 941
(Tex. App.CWaco 1997, pet. denied), disapproved
on other grounds by J.F.C., 96 S.W.3d at 256, and C.H.,
89 S.W.3d at 17.  Drug use and its effect
on a parent=s life and his ability to parent
may establish an endangering course of conduct. 
Dupree v. Tex. Dep=t of
Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.CDallas
1995, no writ).

Evidence of criminal conduct, convictions, and
imprisonment prior to the birth of a child will support a finding that a parent
engaged in a course of conduct that endangered the child=s
well-being.  J.T.G., 121 S.W.3d at
133.  While imprisonment alone does not
constitute a continuing course of conduct that endangers the physical or
emotional well-being of a child, it is a fact properly considered on the issue
of endangerment.  Boyd, 727 S.W.2d
at 533B 34; R.W.,
129 S.W.3d at 743B44.








The record contains substantial evidence of
subsection (D) environmental endangerment and subsection (E) course of conduct
endangerment to the physical or emotional well‑being of D.B.  Because the evidence concerning these two
statutory grounds for termination is interrelated, we consolidate our
examination of it.  See J.T.G.,
121 S.W.3d at 126.








The record demonstrates that David had a history
of illegal drug use.  David admitted that
he had consistently used his bi-monthly paycheck to purchase cocaine; he used
cocaine approximately every two weeks after he was paid.  David acknowledged that it was not a smart
decision for him to use drugs while he was D.B.=s
primary caretaker.  In addition, David
has a lengthy criminal history, including over 160 arrests for charges such as
robbery, unauthorized use of a vehicle, failure to identify a fugitive from
justice, possession of a controlled substance, evading arrest, and forgery of
his mother=s checks, for which he was
serving a one-year sentence in state jail at the time of the trial.  The record also demonstrates that David
relied on others to parent D.B., not just while he was in jail but also while
he was out of jail, and that the people whom he chose to watch D.B. often were
not capable of providing adequate care for D.B. 
For instance, David left D.B. with his diabetic mother despite her poor
health and inability to adequately care for herself.  When David was told about Hodges=s
decision to no longer care for D.B., David responded that D.B. Amight as
well be left in [foster] care.@  

We have carefully reviewed the entire
record.  Looking at the evidence in the
light most favorable to the trial court=s
findings, giving due consideration to evidence that the trial court, as
fact-finder, could reasonably have found to be clear and convincing, we hold
that the court reasonably could have formed a firm belief or conviction that
David knowingly placed D.B. in conditions and engaged in conduct that
endangered D.B.=s physical or emotional well‑being.  See Tex.
Fam. Code Ann. ' 161.001(1)(D), (E); J.F.C.,
96 S.W.3d at 265B66; C.H., 89 S.W.3d at
25; J.T.G., 121 S.W.3d at 124; In re T.J., No. 02-05-00353-CV,
2006 WL 820518, at *6 (Tex. App.CFort
Worth Mar. 30, 2006, no pet.) (mem. op.) (holding that mother=s and
father=s
criminal history and illegal drug use provided sufficient basis to establish
environmental endangerment and course of conduct endangerment).  Accordingly, we hold that the evidence is
legally and factually sufficient to support the trial court=s
finding on environmental endangerment and course of conduct endangerment.  We overrule David=s
second, third, and fourth points.

3.     Best Interest Law and Analysis








In his fifth and sixth points, David argues that
the evidence is legally and factually insufficient to support the trial court=s
finding that termination of his parental rights was in D.B.=s best
interest.  TDFPS contends that the
evidence is legally and factually sufficient to support the trial court=s Abest
interest@
finding. 

Prompt and permanent placement of the child in a
safe environment is presumed to be in the child=s best
interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2002).  There is also
a strong presumption that keeping a child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include:  (1)
the desires of the child; (2) the emotional and physical needs of the child now
and in the future; (3) the emotional and physical danger to the child now and
in the future; (4) the parental abilities of the individuals seeking custody;
(5) the programs available to assist these individuals to promote the best
interest of the child; (6) the plans for the child by these individuals or by
the agency seeking custody; (7) the stability of the home or proposed
placement; (8) the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and (9) any
excuse for the acts or omissions of the parent.  Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex.
1976).  








These factors are not exhaustive; some listed
factors may be inapplicable to some cases; other factors not on the list may
also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

Regarding the first factor, D.B. did not testify
at trial.  However, the evidence
demonstrated that David had not seen D.B. in almost two years and that David
had not sent D.B. any letters nor asked to receive photos of D.B. while he was
incarcerated.   

Regarding the second factorCthe
child=s
present and future physical and emotional needsCOdelusi
testified that D.B. had been moved from a basic foster home to a therapeutic
foster home to address his delayed developmental issues, including his
inability to speak, walk, smile, and attach well with others and his problems
with hoarding food.  While in foster care,
D.B. has received occupational, physical, play, and speech therapies and has
enrolled in a preschool for children with disabilities. 

The environmental endangerment and endangering
course of conduct discussion above addressed the third, fourth, and eighth
factorsCthe
present and future physical and emotional dangers to D.B., as well as David=s
parenting abilities, or lack thereof, and his acts and omissions.








Concerning the fifth factor, David attempted to better himself
while in jail by attending CHANGES, parenting classes, and drug and alcohol
classes.  After he is released, he plans
to get a job, get stable, and take the classes that he needs to take to get his
son back. 

Regarding the party=s plans
for the childCthe sixth factorCDavid
testified that he is not in a position at this moment to care for D.B. because
he is in jail.  TDFPS requested that
David=s parental rights
be terminated because of D.B.=s disabilities,
which were being treated in foster care, and because D.B. had suffered from
neglect and needed a stable place.  Thus,
TDFPS is actively pursuing an adoptive placement for D.B. 

Regarding the stability of the proposed placementCthe
seventh factorCthe evidence demonstrated that
terminating David=s parental rights would allow
TDFPS to pursue adoptive placement for D.B., which would allow him to have the
stability that was lacking in his previous environment.

Finally, concerning the ninth factorCany
excuse for the parent=s acts or omissionsCDavid
admitted that he made mistakes and that he would attempt to turn his life
around once released from jail.








Looking
at all of the evidence in the light most favorable to the best-interest
finding, we hold that a reasonable trier of fact could have formed a firm
belief or conviction that its finding was true. 
See J.F.C., 96 S.W.3d at 266; J.T.G., 121 S.W.3d at 124B25.  Additionally, giving due consideration to
evidence that the fact-finder could have found to be clear and convincing, and
based on our review of the entire record, we hold that a reasonable trier of
fact could have formed a firm belief or conviction that termination of David=s parental rights would
be in the best interest of D.B.  See
In re W.E.C., 110 S.W.3d 231, 247 (Tex. App.CFort Worth 2003, no
pet.); In re S.M.L., 171 S.W.3d 472, 480 (Tex. App.CHouston [14th Dist.] 2005,
no pet.) (holding that clear and convincing evidence existed that termination
of father=s parental rights was in
child=s best interest where,
among other factors, father was incarcerated at time of termination hearing and
had a pattern of criminal and violent conduct). 
Accordingly, we hold that the evidence is legally and factually
sufficient to support the trial court=s best-interest finding.  We overrule David=s fifth and sixth points.

V.  Conclusion

Having overruled David=s six
points, we affirm the trial court=s
judgment terminating his parental rights to D.B.

 

 

PER
CURIAM

 

PANEL F:    WALKER, GARDNER, and MCCOY, JJ.

 

DELIVERED: June 26, 2008











[1]See Tex. R. App. P. 47.4.





[2]D.B.=s mother=s parental rights were also
terminated; however, she did not appeal.





[3]The record also revealed
that the grandmother had a case open with Adult Protective Services because she
was unable to care for herself due to her diabetic condition. 





[4]In addition to the
forgery charge, Cook=s criminal history check
of David revealed that he had prior charges for robbery, unauthorized use of a
vehicle, failure to identify a fugitive from justice, theft of property,
possession of a controlled substance, and evading arrest.  Cook said that of those charges, only the
theft of property charge had been dismissed.