

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-428-CV

IN THE INTEREST OF D.B.

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

### MEMORANDUM OPINION[1]

------------

## I. INTRODUCTION

Appellant David B. appeals the trial court's judgment terminating his parental rights to his son, D.B.[2] In six points, David argues that the trial court abused its discretion by denying his motion for continuance and that the evidence is legally and factually insufficient to support the trial court's judgment terminating his parental rights. Because the trial court did not abuse its

---

[1] *See* TEX. R. APP. P. 47.4.

[2] D.B.'s mother's parental rights were also terminated; however, she did not appeal.

discretion by denying David's motion for continuance and because the record demonstrates that termination of David's parental rights was proper under section 161.001, we will affirm.

## II. FACTUAL BACKGROUND

### A. 2006 CPS Referral

On August 30, 2006, Child Protective Services (CPS) received a referral for neglectful supervision and physical neglect of D.B. by David. D.B. was two years old at the time and lived with David at David's mother's house. The caller initiating the referral indicated that (1) D.B.'s mother had been released from prison, was on drugs, and had access to D.B.; (2) D.B. was left in the primary care of his paternal grandmother, who had difficulty caring for him because she was an insulin-dependent diabetic and had other severe medical problems; (3) David took the grandmother's Social Security check, allegedly to buy food, but there was never any food in the house; (4) the home had trash strewn about and was infested with roaches; and (5) D.B. had run away from his grandmother, and due to her disability, she had trouble catching him.

Approximately a week after the referral came in, CPS investigator Jennifer Cook went to the home and visited with the grandmother and D.B. Although D.B. appeared of average height and weight and did not have any marks or bruises, he was not verbal. The house was sparsely furnished; D.B. slept on

a cushion on the floor, and during the interview, the grandmother sat at a card table with one chair. Cook was concerned about the grandmother's ability to care for D.B. because she did not appear to be in good health; had not bathed; wore soiled clothing; had extremely red eyes, one of which appeared to have an infection; had very swollen legs; and had a hard time walking and sitting.[3]

When Cook made contact with David later that day, he denied all of the allegations. He said that he did not leave D.B.'s mother alone with D.B. David stated that he could provide for D.B. because he was employed with the Como Community Center and received disability benefits because of his arthritis, asthma, and bipolar disorder. David also stated that he felt that his mother, D.B.'s grandmother, could adequately care for D.B.

Cook instructed David to submit to a drug test, which he agreed to do. However, David did not go through with the test. He admitted that he had smoked marijuana within the past six months and said that the test would come back positive for another drug. Cook advised David that he still needed to take the drug test. On September 13, 2006, David told Cook that he still had not taken the drug test and that his last day of work would be September 15

---

[3] The record also revealed that the grandmother had a case open with Adult Protective Services because she was unable to care for herself due to her diabetic condition.

3

because his services were no longer needed at the community center. When David ultimately submitted to a hair follicle test on September 15, 2006, the results came back positive for cocaine.

Cook and her supervisor made a home visit on September 16, 2006. David appeared unable to comprehend the conversation that they were having, and they suspected that he was under the influence of some type of substance. During that visit, David agreed to voluntarily place D.B. with David's stepson, Cedric Clark. Clark had a criminal charge for possession of marijuana pending against him, so CPS placed D.B. with Clark's girlfriend, Tanisha Hodges.

David contacted CPS in October and scheduled an appointment to discuss receiving services. During that appointment, David mentioned that a niece named Lynette Taylor wanted to be considered as a placement for D.B. David said that he was not happy with D.B.'s current placement because Hodges was not allowing him to have as much access to D.B. as he wanted.

After that meeting, David failed to follow through with a scheduled drug assessment test. David and the grandmother apparently had been evicted from the apartment they were previously living in, and Cook had difficulty locating David. On November 28, 2006, David called Cook and told her that he was living in Dallas. After that phone call, Cook did not have further contact with David regarding the August 2006 referral because he did not provide an address

4

or phone number where he could be reached. CPS eventually closed the case for lack of contact with the parents and disposed of the case as "reason to believe for neglectful supervision" of D.B. by David.

**B.    2007 CPS Referral**

On January 22, 2007, Hodges contacted Cook and told her that she could no longer care for D.B. Cook was not able to contact David or D.B.'s mother, so D.B. was placed in foster care. At the time that D.B. left Hodges's care, he had just turned three. Cook observed that D.B. never spoke. Cook said that D.B. appeared to understand verbal commands and could follow them but did not speak one word. Hodges had told Cook that D.B. liked to be very close to people and that he would need to be reminded to use the bathroom. Cook noted that D.B. played right next to her, that he was unable to tell her when he was hungry or thirsty, and that he was "definitely very delayed."

Cook ultimately discovered that D.B.'s mother was in jail on prostitution charges. During Cook's conference with D.B.'s mother, she learned that David was also in jail. Cook thereafter visited David in jail and told him that Hodges could no longer care for D.B. and that he was in foster care. David responded that D.B. "might as well be left in [foster] care." David did not ask how D.B. was doing or where he was. He also told Cook that he was incarcerated for forgery and would be in jail for at least a year.

5

Cook disposed of this new investigation as "reason to believe for neglectful supervision" by David and D.B.'s mother. Cook stated that a preponderance of the evidence showed that David had voluntarily placed D.B. with Hodges who could no longer care for the child, that there were no relatives to care for D.B., that Hodges had not spoken with either parent in several months, that the voluntary placement had not received any financial assistance from D.B.'s parents in order to care for D.B., that both parents were incarcerated at the time of D.B.'s removal, that D.B.'s mother had been arrested on charges of prostitution, and that David had been arrested for forgery.[4]

## C.    David's Perspective

David testified at trial and said that D.B. had lived with him since birth. David's mother, D.B.'s grandmother, helped with raising D.B. D.B.'s mother did not participate in raising D.B.

David said that he tried to provide some financial support for D.B. while he was staying with Hodges; however, he claimed that his stepson Clark did

---

[4] In addition to the forgery charge, Cook's criminal history check of David revealed that he had prior charges for robbery, unauthorized use of a vehicle, failure to identify a fugitive from justice, theft of property, possession of a controlled substance, and evading arrest. Cook said that of those charges, only the theft of property charge had been dismissed.

not come by as he had promised to pick up the money. David said he did not know where Hodges lived, and it never crossed his mind to call CPS to tell them he had money for Hodges. After David's job ended at Como Community Center, he said that he had worked construction in Arlington.

David said that he was not using marijuana and methamphetamines back in September 2006 but admitted that he was using cocaine about every two weeks when he got paid. He said that he did not take advantage of the drug treatment offered by CPS because he did not have transportation.

At the time of trial, David was serving a one-year sentence in state jail for forgery of his mother's social security checks. David said that he had also been convicted of robbery, auto theft, and possession of cocaine. He admitted that he had been arrested on numerous occasions for tickets. In total, David had been arrested over 160 times. David admitted that he was not acting in D.B.'s best interest when he committed the offenses for which he was charged.

David said that D.B. did not have any developmental problems and that D.B. played like other children did. However, David later testified that he had told Clark that he needed to take D.B. to a speech therapist. David did not remember who D.B.'s pediatrician was, but he remembered that D.B. took two naps a day, went to bed at 9 p.m., loved spaghetti and weenies, and enjoyed

7

riding his Big Wheel bike and playing at the park. David also denied any knowledge of episodes when D.B. would eat until he became sick.

David said that he had concerns about D.B.'s staying with Hodges because Hodges would not respond to his questions about how D.B. was doing. David said that he had not seen D.B. in almost two years. He admitted that he had not communicated with the caseworker and had not sent D.B. any letters nor asked to receive photos of D.B.

While he was in jail, David took CHANGES, parenting classes, and drug and alcohol classes. David said that his correspondence from CPS has indicated that he would be able to work his service plan after he was released from jail. David said that when he is released from jail, he wants to get a job, get stable, and take the classes that he needs to take to get his son back. David stated that he loves his son.

### D. D.B.'s Outlook

Bolu Odelusi, the ongoing CPS caseworker for D.B.'s case, testified that when D.B. was placed in foster care, he could not speak, he did not smile, he did not walk, he did not attach well to others, and he "hoarded food." CPS moved D.B. from a basic foster home to a therapeutic foster home to address his delayed developmental issues. While in therapeutic foster care, D.B. received occupational, physical, play, and speech therapies and was enrolled

8

in a preschool for children with disabilities. D.B. is thriving in foster care; he is very attached to his foster mom; he is now speaking; he interacts well with children in the home; and he is getting much better about not hoarding food.

Odelusi testified that it was not in D.B.'s best interest for David to be given additional time to work the service plan. D.B. has several disabilities and "really needs to be in a place where stability is provided." Odelusi also testified that it was in D.B.'s best interest for David's parental rights to be terminated because David has an extensive criminal history, including illegal drug use during the time that he was D.B.'s primary caregiver; because David placed D.B. in an environment where he was not properly taken care of; and because David failed to communicate with CPS after he received a service plan.

### E. Trial Court's Decision

At the conclusion of the termination trial, the trial court took judicial notice of a "Certificate of Paternity Registry" that was on file with the court indicating that a diligent search of the paternity registry had been made, and no notice of intent to claim paternity had been located pertaining to D.B. The trial court thereafter terminated David's parental rights to D.B. and included the following in the "Order of Termination":

9

**9. Termination of Alleged Biological Father DAVID [B.'s] Parental Rights**

9.1. The Court finds by clear and convincing evidence that, after having waived service of process or being served with citation in this suit, DAVID [B.] did not respond by filing an admission of paternity or by filing a counterclaim for paternity or for voluntary paternity to be adjudicated under chapter 160 of the Texas Family Code before the final hearing in this suit.

9.2. The Court finds by clear and convincing evidence that David [B.] has:

9.2.1. knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the emotional or physical well-being of the child; and

9.2.2. engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical and emotional well-being of the child; and

9.3. The Court also finds by clear and convincing evidence that termination of the parent-child relationship, if any exists or could exist, between the alleged father and [D.B.], the child the subject of this suit, is in the best interest of the child.

This appeal followed.

## III. MOTION FOR CONTINUANCE

In his first point, David argues that the trial court abused its discretion by denying his motion for continuance and by holding the termination trial prior to

10

his release from jail. Specifically, David complains that he thought he would be able to work his service plan after his release from jail because some of the required services were not available in jail.

To determine whether a trial court abused its discretion, we must decide whether it acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986). Whether the trial court grants or denies a motion for continuance is within its sound discretion. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002); *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986); *see also In re E.L.T.*, 93 S.W.3d 372, 374 (Tex. App.—Houston [14th Dist.] 2002, no pet.). The trial court's action in denying a continuance will not be disturbed unless the record discloses a clear abuse of discretion. *State v. Wood Oil Distrib. Inc.*, 751 S.W.2d 863, 865 (Tex. 1988).

A motion for continuance shall not be granted except for sufficient cause supported by an affidavit, consent of the parties, or by operation of law. TEX. R. CIV. P. 251. If appellant provides no record of the evidence presented to the trial court, we must presume that the evidence supports the ruling. *See Wil-Roye Inv. Co. II v. Wash. Mut. Bank, F.A.*, 142 S.W.3d 393, 401 (Tex.

11

App.—El Paso 2004, no pet.); *In re Guardianship of Berry*, 105 S.W.3d 665, 667 (Tex. App.—Beaumont 2003, no pet.).

Here, David submitted a verified motion for continuance, and we have been provided with a record of the evidence presented to the trial court. We will therefore review that evidence and determine whether the trial court abused its discretion by denying David's motion for a continuance.

The record reveals that at the April 2007 status review hearing, the trial court found that David

> has reviewed and understands the service plan and has been advised that unless he is willing and able to provide the child with a safe environment, even with the assistance of a service plan, *within the reasonable period of time specified in the plan*, his parental and custodial duties and rights may be subject to restriction or to termination or the child may not be returned to him. [Emphasis added.]

At the time of that hearing, the initial service plan stated that the permanency goal was "Family Reunification" and that the projected date for achieving permanency was "1/31/08," meaning that David had until January 31, 2008 to complete the services listed on his plan. Odelusi testified, however, that a parent's completion of a service plan did not guarantee that a child would be returned to that parent.

The "Permanency Plan and Permanency Progress Report" submitted by the case worker on July 12, 2007, repeatedly stated that "[u]pon return from

12

incarceration, [David] will" comply with various provisions. However, it also stated that David "has not returned any form of communication to the worker. It is the worker's assumption that [David] is not doing any type of services while incarcerated." Two weeks later, on July 26, 2007, the trial court held a permanency hearing and entered an order finding that David had "not demonstrated adequate and appropriate compliance with the service plan," setting the case for trial on November 19, 2007, and setting a dismissal date of January 29, 2008 pursuant to family code section 263.306(11). *See* TEX. FAM. CODE ANN. § 263.306(11) (Vernon 2002). Prior to the hearing date, on November 8, 2007, the case worker submitted a revised permanency plan, which reflected that family reunification was no longer the permanency goal and that adoption by a relative was being pursued.

David filed a motion for continuance, requesting an opportunity to complete the services in his plan. David, however, had not even begun his service plan (except to the extent, if any, that the parenting, drug and alcohol classes he took in jail satisfied any aspect of the plan), which required him to participate in parenting classes through the Child and Family Guidance Center; demonstrate the ability to participate in the rearing of D.B. while he was in the possession of the foster home caregivers; maintain stable housing, employment, and transportation; undergo a drug/alcohol assessment through Resource

13

Recovery, including random urinalyses; maintain a visitation schedule with D.B.; participate in and follow the recommendations of the individual counseling offered through Positive Influence; undergo a psychological evaluation through Positive Influence; comply with the requirements of his probation and his probation officer; and maintain contact with the CPS worker. David could not have started and completed all of the required services between his December 21, 2007 expected release date and the completion date listed in the service plan—January 31, 2008. And David's motion for continuance failed to allege exactly how long he thought it would take him to complete these various services. Moreover, during his months in jail, David had not communicated with the CPS case worker or responded to her correspondence.

The record demonstrates that David had approximately four months' notice of the trial setting but waited to file a motion for continuance until the morning that the case was called for trial. Although David knew his expected release date, he did not communicate it to his caseworker or move for a continuance sooner to enable him a better opportunity to start and complete all the services between his December 21, 2007 release date and the January 31, 2008 compliance date set forth in the initial service plan.

Additionally, David's motion for continuance and his arguments in support of the motion do not claim that he was unprepared for trial. David has thus

14

failed to demonstrate that the trial court abused its discretion by denying his motion for continuance. *See E.L.T.*, 93 S.W.3d at 375. We therefore overrule David's first point.

## IV. FINDINGS SUPPORTING TERMINATION

### A. Section 161.002 Finding

Although David raises legal and factual sufficiency challenges to the trial court's findings that he knowingly placed D.B. with persons or allowed D.B. to remain in conditions that endangered D.B.'s physical or emotional well-being, he did not challenge the trial court's finding that his rights should be terminated under section 160.002(b)(1). TDFPS argues that the trial court's judgment should be affirmed based on this unchallenged finding.

Section 161.002(b)(1) provides that "[t]he rights of an alleged father may be terminated if: (1) after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160." TEX. FAM. CODE ANN. § 161.002(b)(1) (Vernon Supp. 2007). Subsection (b)(1) thus allows a trial court to summarily terminate the rights of an alleged biological father who does not assert his paternity by filing an admission of paternity or a counterclaim for paternity. *Id.*; *see Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 357 (Tex. App.—Austin 2000, no pet.). If the alleged father does file an admission of

15

paternity or a counterclaim for paternity, then subsection (a) allows the alleged biological father "to stave off summary termination of his rights and require[s TDFPS] to meet the high burden of proof found in section 161.001" of the Texas Family Code. *Phillips*, 25 S.W.3d at 357; *see* TEX. FAM. CODE ANN. § 161.002(a). Therefore, by filing an admission or counterclaim for paternity, the alleged father is given the right to require TDFPS to prove by clear and convincing evidence that he engaged in one of the types of conduct listed in section 161.001(1) and that termination is in the best interest of the child. *Phillips*, 25 S.W.3d at 357. If the alleged father, however, does not file such an admission or counterclaim, then subsection (b) permits the trial court to summarily terminate his parental rights without TDFPS's having to meet the high burden of proof found in section 161.001. *See* TEX. FAM. CODE ANN. § 161.002(a); *Phillips*, 25 S.W.3d at 357.

TDFPS in its brief characterizes the record as "factually confusing regarding this issue," and our review of the record confirms this. After David was served, he filled in the blanks on a preprinted "Request for Counsel," which stated that he was "a parent of the child named above." David's appointed counsel thereafter filed a general denial that did not mention paternity. Following the April 2007 status hearing, the trial court ordered a paternity test; however, no paternity test results appear in the record. During the termination

16

trial, David testified that he is D.B.'s father, that he had raised D.B. from birth, and that he remained the person responsible for D.B.; no contrary evidence was admitted. At the end of the trial, the trial court took judicial notice, without objection, that "there is a Certificate of Paternity Registry Search on file in this case indicating that a diligent search of the Paternity Registry has been made, and no notice of intent to claim paternity has been located concerning the child the subject of this suit."

Because David failed to challenge this ground on appeal, TDFPS requests that we affirm the termination of his parental rights based solely on this ground. *See In re A.D.*, No. 04-02-00310-CV, 2002 WL 31829510, at *2 (Tex. App.—San Antonio Dec. 18, 2002, no pet.) (not designated for publication) (affirming termination because appellant, one of multiple alleged biological fathers, failed to file an admission of paternity or counterclaim for paternity under section 161.002(b)(1)). However, we question the applicability of section 161.002 based on the factual background described above and based on the limited case law addressing this issue. Therefore, in the interest of justice and because we are required to strictly construe involuntary termination statutes in favor of the parent, we will proceed to analyze the sufficiency of the evidence to support the trial court's other section 161.001 findings. *See Holick*

*v. Smith*, 685 S.W.2d 18, 20–21 (Tex. 1985); *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

**B.      Section 161.001 Findings**

In his second through sixth points, David argues that there is legally and factually insufficient evidence to prove that he violated section 161.001(1)(D) and (E) and that termination is in D.B.'s best interest.  TDFPS responds that the evidence is legally and factually sufficient to support the trial court's findings.

**1.      Standard of Review**

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2007); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls

between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id.*

19

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated the environmental endangerment or course of conduct endangerment provisions found in section 161.001(1)(D) and (E) and that the termination of the parent's parental rights would be in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## 2.    Endangerment Law and Analysis

Endangerment means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). To prove endangerment under subsection (D), TDFPS had to prove that David (1) knowingly (2) placed or allowed D.B. to remain (3) in conditions or surroundings that endangered his physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(D). Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of D.B.'s physical well-being was the direct result of David's conduct, including acts, omissions, or failures to act. *J.T.G.*, 121 S.W.3d at 125; *see* TEX. FAM. CODE ANN. § 161.001(1)(E). Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125; *see* TEX. FAM. CODE ANN. § 161.001(1)(E). However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether

21

termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

Stability and permanence are paramount in the upbringing of children. *See In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied). A fact-finder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 256, *and C.H.*, 89 S.W.3d at 17. Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ).

Evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child's well-being. *J.T.G.*, 121 S.W.3d at 133. While imprisonment alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a fact properly considered on the issue of endangerment. *Boyd*, 727 S.W.2d at 533–34; *R.W.*, 129 S.W.3d at 743–44.

22

The record contains substantial evidence of subsection (D) environmental endangerment and subsection (E) course of conduct endangerment to the physical or emotional well-being of D.B. Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it. *See J.T.G.*, 121 S.W.3d at 126.

The record demonstrates that David had a history of illegal drug use. David admitted that he had consistently used his bi-monthly paycheck to purchase cocaine; he used cocaine approximately every two weeks after he was paid. David acknowledged that it was not a smart decision for him to use drugs while he was D.B.'s primary caretaker. In addition, David has a lengthy criminal history, including over 160 arrests for charges such as robbery, unauthorized use of a vehicle, failure to identify a fugitive from justice, possession of a controlled substance, evading arrest, and forgery of his mother's checks, for which he was serving a one-year sentence in state jail at the time of the trial. The record also demonstrates that David relied on others to parent D.B., not just while he was in jail but also while he was out of jail, and that the people whom he chose to watch D.B. often were not capable of providing adequate care for D.B. For instance, David left D.B. with his diabetic mother despite her poor health and inability to adequately care for herself.

23

When David was told about Hodges's decision to no longer care for D.B., David responded that D.B. "might as well be left in [foster] care."

We have carefully reviewed the entire record. Looking at the evidence in the light most favorable to the trial court's findings, giving due consideration to evidence that the trial court, as fact-finder, could reasonably have found to be clear and convincing, we hold that the court reasonably could have formed a firm belief or conviction that David knowingly placed D.B. in conditions and engaged in conduct that endangered D.B.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E); *J.F.C.*, 96 S.W.3d at 265–66; *C.H.*, 89 S.W.3d at 25; *J.T.G.*, 121 S.W.3d at 124; *In re T.J.*, No. 02-05-00353-CV, 2006 WL 820518, at *6 (Tex. App.—Fort Worth Mar. 30, 2006, no pet.) (mem. op.) (holding that mother's and father's criminal history and illegal drug use provided sufficient basis to establish environmental endangerment and course of conduct endangerment). Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding on environmental endangerment and course of conduct endangerment. We overrule David's second, third, and fourth points.

### 3. Best Interest Law and Analysis

In his fifth and sixth points, David argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his

24

parental rights was in D.B.'s best interest. TDFPS contends that the evidence is legally and factually sufficient to support the trial court's "best interest" finding.

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371−72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when

25

appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Regarding the first factor, D.B. did not testify at trial. However, the evidence demonstrated that David had not seen D.B. in almost two years and that David had not sent D.B. any letters nor asked to receive photos of D.B. while he was incarcerated.

Regarding the second factor—the child's present and future physical and emotional needs—Odelusi testified that D.B. had been moved from a basic foster home to a therapeutic foster home to address his delayed developmental issues, including his inability to speak, walk, smile, and attach well with others and his problems with hoarding food. While in foster care, D.B. has received occupational, physical, play, and speech therapies and has enrolled in a preschool for children with disabilities.

The environmental endangerment and endangering course of conduct discussion above addressed the third, fourth, and eighth factors—the present and future physical and emotional dangers to D.B., as well as David's parenting abilities, or lack thereof, and his acts and omissions.

26

Concerning the fifth factor, David attempted to better himself while in jail by attending CHANGES, parenting classes, and drug and alcohol classes. After he is released, he plans to get a job, get stable, and take the classes that he needs to take to get his son back.

Regarding the party's plans for the child — the sixth factor — David testified that he is not in a position at this moment to care for D.B. because he is in jail. TDFPS requested that David's parental rights be terminated because of D.B.'s disabilities, which were being treated in foster care, and because D.B. had suffered from neglect and needed a stable place. Thus, TDFPS is actively pursuing an adoptive placement for D.B.

Regarding the stability of the proposed placement — the seventh factor — the evidence demonstrated that terminating David's parental rights would allow TDFPS to pursue adoptive placement for D.B., which would allow him to have the stability that was lacking in his previous environment.

Finally, concerning the ninth factor — any excuse for the parent's acts or omissions — David admitted that he made mistakes and that he would attempt to turn his life around once released from jail.

Looking at all of the evidence in the light most favorable to the best-interest finding, we hold that a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *See J.F.C.*, 96 S.W.3d at 266;

*J.T.G.*, 121 S.W.3d at 124–25. Additionally, giving due consideration to evidence that the fact-finder could have found to be clear and convincing, and based on our review of the entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that termination of David's parental rights would be in the best interest of D.B. *See In re W.E.C.*, 110 S.W.3d 231, 247 (Tex. App.—Fort Worth 2003, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding that clear and convincing evidence existed that termination of father's parental rights was in child's best interest where, among other factors, father was incarcerated at time of termination hearing and had a pattern of criminal and violent conduct). Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. We overrule David's fifth and sixth points.

## V. CONCLUSION

Having overruled David's six points, we affirm the trial court's judgment terminating his parental rights to D.B.

PER CURIAM

PANEL F:    WALKER, GARDNER, and MCCOY, JJ.

DELIVERED: June 26, 2008

28